**Sheila WIDNALL, Secretary of the Air Force, Appellant,**

**and**

**Logistics Techniques, Inc., Appellant,**

**v.**

**B3H CORPORATION, Intervenor,**

**and**

**Martin Marietta Technical Services, Inc., Intervenor.**

**B3H CORPORATION, Appellant,**

**v.**

**Sheila WIDNALL, Secretary of the Air Force, Appellee,**

**and**

**Logistics Techniques, Inc., Intervenor,**

**and**

**Martin Marietta Technical Services, Inc., Intervenor.**

**Nos. 95–1042 through 95–1044.**

United States Court of Appeals, Federal Circuit.

Feb. 8, 1996.

Shalom Brilliant, Senior Trial Counsel, Commercial Litigation Branch, Department of Justice, Washington, D.C., argued for appellant, Sheila Widnall, Secretary of The Air Force. With him on the brief were Frank W. Hunger, Assistant Attorney General and David M. Cohen, Director. Also on the brief were Colonel C. Richard Pennington and Major H. Josseph Batey, Air Force Legal Services Agency, Arlington, Virginia, and Clarence D. Long, III, Department of the Air Force, Office of the General Counsel, Washington, D.C., of counsel. Charles W. Mahan, of Dayton, OH, argued for appellant, Logistics Techniques, Inc., in no. 95–1042 and intervenor, Logistics Techniques, Inc., in nos. 95–1043 and 95–1044.

Ira E. Hoffman, McAleese & Associates, P.C., McLean, Virginia, argued for intervenor, B3H Corporation.

James F. Worrall, Venable, Baetjer, Howard & Civiletti, Washington, D.C., representing intervenor, Martin Marietta Technical Services, Inc.

Before NEWMAN, LOURIE, and CLEVENGER, Circuit Judges.

CLEVENGER, Circuit Judge.

The Secretary of the Air Force (Air Force) and Logistics Techniques, Inc. (LOGTEC) appeal the July 8, 1994 decision of the General Services Administration Board of Contract Appeals (GSBCA or Board), *B3H Corp. v. Department of Air Force*, GSBCA No. 12813–P, 94–3 B.C.A. (CCH) ¶ 27,068, 1994 WL 372020 (1994), granting the protest of B3H Corporation (B3H) in a best value procurement.[1] B3H cross-appeals the GSBCA's dismissal of B3H's protest based on alleged improprieties involving Air Force personnel and LOGTEC. We reverse the Board's granting of B3H's protest on the best value issue and affirm the Board's denial of B3H's protest on the procurement impropriety issue.

I

On June 8, 1992 the Air Force solicited a contract on an indefinite delivery/indefinite

---

1. Martin Marietta Technical Services, Inc. elected not to participate in this appeal.

quantity basis to provide technical support for the Air Force Material Command at Wright–Patterson Air Force Base. The solicitation stated that evaluation of the offerors would be based on technical, managerial, and cost factors in descending order of importance. At issue in this case are the portions of that solicitation reserved for small businesses. Section M–991 of the solicitation provided, in pertinent part, that "[t]he Government will award a contract resulting from this solicitation to the responsible offeror whose offer, conforming to the solicitation, will provide the best value to the Government.... The Government reserves the right to award to other than the lowest offeror."

The Source Selection Evaluation Board (SSEB) evaluated, among other companies, the proposals of LOGTEC, Aries Systems International, Inc. (Aries), and B3H. The SSEB determined that while the estimated cost of the LOGTEC offer was higher than B3H and Aries, LOGTEC and Aries were higher rated in the technical area. LOGTEC was also higher rated than Aries and B3H in the management area. After a working group performed a price/technical tradeoff analysis, on February 18, 1994 the Source Selection Authority (SSA) awarded the contracts at issue to LOGTEC and Aries determining that these offerors provided the best value to the Government.

B3H filed a protest in response to the SSA's findings on April 15, 1994. In relevant part, B3H alleged that the awards were improper because: (1) the Air Force failed to select the company offering the best value; and (2) the procurement was improperly tainted by frequent pre-award golf matches between Jerry George, the Air Force Program Manager, and LOGTEC personnel. The GSBCA dismissed the impropriety issue on May 18, 1994 as untimely filed. On May 19, 1994, B3H moved for reconsideration of the impropriety issue.

On July 28, 1994, the GSBCA denied B3H's motion to reconsider the impropriety issue because B3H failed to plead necessary information as to why its protest was timely. Nonetheless, the GSBCA granted B3H's protest on the best value issue. The GSBCA

held that the SSA did not adequately justify the higher cost of LOGTEC and Aries, even after the price/technical tradeoff analysis had been considered. Nor, in the Board's opinion, did the record as a whole demonstrate that the added value of the LOGTEC and Aries proposals were worth their higher price. Having granted B3H's best value protest, the GSBCA allowed the Air Force to continue its contracts with LOGTEC and Aries, but prohibited the Air Force from renewing the options on the contracts unless the awards were affirmed in a new source selection.

## II

The scope of our review of a decision by an agency board of contract appeals is set forth in 41 U.S.C. § 609(b) (1988):

[T]he decision of the agency board on any question of law shall not be final or conclusive, but the decision on any question of fact shall be final and conclusive and shall not be set aside unless the decision is fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or if such decision is not supported by substantial evidence.

■ This case involves determining the Board's proper method of review when examining a best value agency procurement decision, a question of law that we address de novo. *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1054 (Fed.Cir.1993).

## III

At issue in this case is a best value procurement authorized by 48 C.F.R. § 15.605(c) (1994) ("[I]n certain acquisitions the Government may select the source whose proposal offers the greatest value to the Government in terms of performance and other factors."). Because this contract involves the procurement of automatic data processing equipment, GSBCA review of the agency's decision is governed by the Competition in Contracting Act of 1984 (CICA), as amended, 40 U.S.C. § 759(f)(5)(B) (1988):

If the board determines that a challenged agency action violates a statute or regulation or the conditions of any delegation of

procurement authority issued pursuant to this section, the board may suspend, revoke, or revise the procurement authority of the Administrator or the Administrator's delegation of procurement authority applicable to the challenged procurement.

■ This case must be viewed in light of the many previous cases under CICA in which the Board has reviewed an agency's best value choice. Precedent dictates that the Board's task on review is to determine if an agency's procurement decision is grounded in reason. Once the Board determines that the agency's selection is so grounded, it then defers to the agency's decision even if the Board itself might have chosen a different proposal. *See Oakcreek Funding Corp.*, GSBCA No. 11244–P, 91–3 B.C.A. (CCH) ¶ 24,200, at 121,041, 1991 WL 133389 (1991).

In an early post-CICA decision, *DALFI, Inc.*, GSBCA No. 8755–P, 87–1 B.C.A. (CCH) ¶ 19,552, 1986 WL 20777 (1986) (*DALFI I*), the Board upheld a protest of DALFI for a contract selection by the Naval Aviation Logistics Center (NALC). The NALC had chosen the lower rated $17 million proposal of SDI over the higher rated $20 million DALFI proposal. The GSBCA held that the NALC erred in part by taking SDI's assertion of a lower cost to the Government at face value and not conducting a price realism analysis that would assess the proposal's true cost. The Board stated that the procurement had been "converted . . . from one for the highest technically rated proposal representing the best buy to the Government into one for the lowest price for a technically acceptable proposal." *DALFI I*, at 98,809. Nevertheless, the Board later accepted the agency's choice after the agency quantified the proposal's technical differences and determined that the technical superiority of DALFI was not worth its higher cost. *DALFI, Inc.*, GSBCA No. 8975–P–R, 87–3 B.C.A. (CCH) ¶ 20,070, at 101,628, 1987 WL 41150 (1987) (*DALFI II*); *cf. Pyramid Technology Corp.*, GSBCA No. 8743–P, 87–1 B.C.A. (CCH) ¶ 19,580, at 99,022–23, 1987 WL 46607 (1987) (contracting officer properly relied on lower price when the technical merits of the offerors were similar).

Once an agency has independently rated each proposal to determine its fulfillment of the requirements of the contract's solicitation, the agency typically performs a tradeoff analysis singling out and evaluating the differences between each of the qualifying proposals. These differences, often termed discriminators, may be either quantified or nonquantified for the Board does not require that each difference in a proposal be assigned an exact dollar value representing its worth to the Government. *See TRW Inc.*, GSBCA No. 11309–P, 92–1 B.C.A. (CCH) ¶ 24,389, at 121,789, 1991 WL 175673 (1991).

Even if the GSBCA disagrees with the reasonableness of a portion of an agency's justification, it will accept agency procurement decisions if the remaining agency analysis can stand on its own. In *Computer Sciences Corp.*, GSBCA No. 11497–P, 92–1 B.C.A. (CCH) ¶ 24,703, 1991 WL 286233 (1991), the agency awarded a contract to Boeing rather than accepting the less expensive proposal of CSC. The decision process consisted of starting with the proposed costs of each offer and adding additional charges quantifying estimates as to how much each proposal would actually cost the agency during the life of the contract. For example, the agency determined that CSC's cheaper, technically inferior proposal would actually cost the agency over $350 million for necessary future upgrades and maintenance. The SSA chose Boeing based on this analysis because Boeing's true cost was only 1% greater than CSC's. *Computer Sciences Corp.*, at 123,-289–92. On review of CSC's protest, the GSBCA found that the agency's determinations regarding paper consumption and future maintenance costs did not have a rational basis. Nevertheless, after factoring out these items from the analysis, Boeing's technically superior proposal was only 5.33% more expensive than CSC in true costs. Thus, the Board upheld the decision of the SSA since the SSA had made a reasonable best value decision given the small increase in price the Government would have to pay for Boeing's technically superior proposal. *Computer Sciences Corp.*, at 123,297–98; *cf. Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed.Cir.1992) (noting that de

minimis errors by agency are insufficient to sustain protest).

In contrast, when an agency's decision has no basis in reason, the GSBCA will overturn the agency's decision. In *Network Solutions, Inc. v. Department of Air Force,* GSBCA Nos. 11498-P, 11532-P, 92-3 B.C.A. (CCH) ¶ 25,083, 1992 WL 107863 (1992), *vacated on other grounds sub nom. Electronic Data Sys. Corp. v. Rice,* 988 F.2d 128 (Fed. Cir.1992), the SSA awarded a contract to the more expensive offeror, EDS, in part because of a cost/technical tradeoff analysis. The solicitation included a request to each offeror to estimate the amount of time necessary for its system to complete a hypothetical computer task. *Network Solutions,* at 125,028-29. After the losing offeror filed a protest, the GSBCA rejected the SSA's conclusion that EDS' offer was more efficient. The Board noted that the SSA had failed to document a reasoned cost/technical tradeoff and found that EDS' claim that its system would perform a hypothetical sample task faster than other proposals was insufficient to justify EDS' higher price. *Network Solutions,* at 125,043-44.[2]

Recently, this court has reviewed two cases in which the Board initially refused to accept an agency's procurement decision based on the lack of a reasoned explanation for the selection. In both cases the Board and this court later upheld the agency selection after the agency reevaluated its decision and proffered reasonable explanations as to why its initial choice was correct. In *International Business Machs. Corp. & Lockheed Missiles & Space Co.,* GSBCA Nos. 11359-P, 11362-P, 94-2 B.C.A. (CCH) ¶ 26,782, 1991 WL 542336 (1991) (*Lockheed I*), the Board granted IBM's and Lockheed's protests, rejecting the IRS' acceptance of AT & T's proposal to build its automation system. The IRS could not justify the increased cost of $500-700 million for the project simply by stating that AT & T's winning proposal was technically superior to the lower offers. Furthermore, AT & T's offer was only 15%

more technically superior than the other proposals. The Board directed the IRS to justify its award to AT & T or initiate a new procurement for the contract. *Lockheed I,* at 133,201-03.

The IRS formed a working group to reanalyze the procurement, which performed a price/technical tradeoff analysis by identifying quantifiable and non-quantifiable discriminators between the various proposals. The group assigned dollar values to four quantifiable discriminators (price risk, software integration, system performance and training) in an attempt to determine the true cost to the Government of each proposal. The group also designated negative, positive or neutral ratings for ten non-quantifiable discriminators. Based on this analysis, the IRS concluded that the technical superiority of the AT & T proposal made it the best value to the Government despite its higher price. *Lockheed Missiles & Space Co. v. Department of Treasury,* GSBCA Nos. 11776-P, 11777-P, 93-1 B.C.A. (CCH) ¶ 25,401, at 126,499-501, 1992 WL 512122 (1992) (*Lockheed II*), *aff'd,* 4 F.3d 955 (Fed.Cir. 1993). Lockheed and IBM again filed protests, which the Board denied, stating:

All the agency was required to do was present a reasoned analysis showing that the Government expects to receive benefits commensurate with the price premium it will have to pay.... [W]e do not lose sight of the basic principle that, in making its analysis, the agency is essentially exercising its business judgment, albeit one involving taxpayers' money, and not conducting a definitive or all-inclusive study. *Lockheed II,* at 126,508.

Although the GSBCA disagreed with the IRS' consideration of training as a quantified discriminator in its analysis, the Board held that the IRS had not abused its discretion. *Lockheed II,* at 126,507-09.[3] Affirming the judgment of the Board on appeal, *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955 (Fed.Cir.1993) (*Lockheed III*), this court stated: "[A] proposal which is one point bet-

---

**2.** The redacted version of the *Network Solutions* opinion issued to the public omits quantitative information regarding the technical efficiency of EDS' bid.

**3.** The redacted version of the *Lockheed II* opinion issued to the public omits quantitative information regarding the technical efficiency of the Lockheed and AT & T bids.

ter than another but costs millions of dollars more may be selected if the agency can demonstrate within a reasonable certainty that the added value of the proposal is worth the higher price." *Lockheed III,* at 960 (emphasis deleted).

In *Grumman Data Sys. Corp. v. Department of the Air Force,* No. 11635–P, 94–2 B.C.A. (CCH) ¶ 26,821, 1994 WL 102044 (1992) (*Grumman I* ), the Board sustained Grumman's protest of the Air Force's decision to award a computer networking contract to Contel. The SSA had concluded that the technical enhancements in Contel's proposal warranted the $33.9 million (58.8%) higher price. The Board found that the SSA had failed to explain via quantification or reasoned analysis why the increased value of Contel was worth the price. Simply adhering to the solicitation's ranking of technical merit over cost was insufficient. *Grumman I,* at 133,401–03. The Board directed the Air Force to justify its award to Contel or initiate a new procurement for the contract. *Grumman I,* at 133,406.

In an effort to comply with the GSBCA's directive, the Air Force confirmed its initial selection by preparing a comprehensive cost/technical tradeoff analysis, which delineated quantifiable and nonquantifiable discriminators between the two proposals. Quantifiable factors included user friendliness, systems administration and technical support. Each factor was broken down into subfactors, and each subfactor was assigned a dollar value depicting how much Contel's superior technical expertise in that subfactor was worth to the Air Force. This analysis revealed that the technical superiority of the Contel proposal made it worth $42.25 million more to the Air Force than the Grumman proposal. The Air Force also considered various non-quantifiable factors in its evaluation. *Grumman Data Sys. Corp. v. Department of the Air Force,* No. 11939–P, 94–2 B.C.A. (CCH) ¶ 26,822, at 133,419, 1992 WL 571025 (1992) (*Grumman II* ), *aff'd,* 15 F.3d 1044 (Fed.Cir.1994). Grumman again filed a protest. After considering this renewed analysis, the Board upheld the Air Force's award. The Board agreed with the Air Force that Grumman's proposal would re-

quire more maintenance and training and that its system would be less capable of handling multiple tasks. *Grumman II,* at 133,435–36. Additionally, the Air Force properly considered the increased time for training on the Grumman system, the increased productivity associated with Contel's more powerful processors, the more extensive support team, the increased user friendliness, and the lower system administration time. *Grumman II,* at 133,439. On appeal, this court affirmed the decision of the Board. *Grumman Data Sys. Corp. v. Widnall,* 15 F.3d 1044 (Fed.Cir.1994) (*Grumman III* ).

Post–*Grumman III* decisions of the GSBCA accepting higher cost proposals as the best value to the Government continue to enforce the grounded in reason standard for review of the agency's choice. For example, the Board upheld the agency's rejection of a proposal because the novelty of the offeror's technology posed a danger of intolerable system failure. *ATLIS Federal Servs., Inc. v. Department of Health and Human Servs.,* GSBCA No. 12959–P, 95–1 B.C.A. ¶ 27,486, at 136,970–71, 1994 WL 750293 (1994). Similarly, the Board upheld the agency's determination to reject a proposal because the offeror's proposed solution relied on subcontractors who used unproven software development tools and had a high rate of employee turnover. *Titan Corp. v. Department of Commerce,* GSBCA No. 13103–P, 95–2 B.C.A. (CCH) ¶ 27,779, at 138,539, 1995 WL 386851 (1995).

## IV

This case involves a solicitation which stated that technical, managerial and cost factors would be evaluated in that order of precedence. The offers of LOGTEC and Aries were judged to be superior in the technical area. While LOGTEC was rated higher than Aries and B3H in the management area, total cost evaluations revealed that LOGTEC and Aries were respectively 15% and 8.8% more expensive than B3H's offer. The Air Force created a price/technical tradeoff working group (P/TTO Group) to further analyze the proposals. The P/TTO Group identified one quantified discriminator quantifying the estimated risk that an offeror would

need to expend additional funds to provide trained personnel than the offeror originally calculated. This dollar value was added to the total evaluated cost of each offer to obtain a value adjusted cost. Although B3H's price risk was approximately four times higher than LOGTEC's and Aries', the value adjusted costs of LOGTEC and Aries were still respectively 16% and 4% higher than B3H.

The P/TTO Group also identified six non-quantified discriminators: (1) experience with the relevant Air Force software; (2) hardware maintenance experience; (3) hardware sizing experience; (4) data management experience; (5) whether the offeror already had offices near the Air Logistics Centers (ALC co-location); and (6) the offeror's subcontractor control plan. Each offeror was assigned a positive, neutral or negative evaluation for all six discriminators. The P/TTO Group gave LOGTEC a positive rating for the subcontractor control plan discriminator and assigned Aries and B3H neutral ratings for that category. While LOGTEC and Aries received a negative rating and B3H a neutral one for the hardware maintenance experience discriminator, the ratings of LOGTEC and Aries were superior to B3H's for all other non-quantified discriminators. With respect to those superior ratings, the P/TTO Group predicted that the proposal of B3H would result in completing the task order in a longer period of time and with a lower level of quality.

Relying upon the analysis of the P/TTO Group, the SSA in his written determination that LOGTEC's superior proposal was worth its extra cost stated: "I assess that the relative superiority of the [LOGTEC] proposal as indicated in the [excellent] rating in the Management Area will result in improved quality and cost control that represents value to the Government which mitigates the ... difference in cost." As to the award to Aries, the SSA similarly wrote: "B3H had more negative and fewer positive non-quantified discriminators than [Aries].... The technical superiority of [Aries] represents the Best Value to the Government considering the [small] difference in cost...."

At the B3H protest hearing, the SSA elaborated at length on the rationale for choosing LOGTEC and Aries. When B3H asked the SSA to explain in specific detail the basis for his decision, the SSA's response took up forty-three pages of testimony and covered all seven discriminators explaining how he considered them, evaluated their import, and why he did what he did. He had earlier given twenty-two pages of testimony on the same subject. In general, the SSA's testimony was that prior experience in the areas of the various non-quantifiable discriminators resulted in shorter start up times, quicker execution, a better quality product, shorter learning curves, and less staffing time, all of which would produce economic benefits to the Air Force. With respect to the issue of what justifies the higher estimated costs of the awards, the SSA testified:

> If specifically you mean what do we expect would occur through the execution of the contract with Aries and Logtec that would justify the increased price ... we can go back through the discriminators if you like and we can go back through the superior technical management proposal for characteristics. But in summary, what we would expect is that we would get a ... substantially higher quality product. We would expect that we would be in a better position to control and understand the cost that would be expended in the conduct of the individual task. That is that the costs that are identified in the initial response to the statement of work, would in fact be much closer to the cost that would be expected to be incurred through the conduct of that cost.

In essence, the SSA determined that the inferior management and lower non-quantified discriminator ratings of B3H meant that there was a likelihood that B3H's offer would produce unnecessary cost overruns and actually cost more than an estimated value adjusted cost, which was designed to factor in that risk. Thus, the SSA concluded the superior management and technical evaluations of LOGTEC and Aries justified incurring the increased value adjusted cost.

## V

On appeal, the Air Force contends that the Board committed legal error by reading into the words "reasonable certainty" in *Lockheed III* a requirement that a measure of proof, beyond that found in precedent, is necessary in order to satisfy the grounded in reason test. As a result, the Air Force argues that acceptance of the Board's reasoning would improperly shift the burden of proof to the agency during a protest proceeding and would allow the Board to substitute its own judgment for that of an agency making a procurement decision. We agree with the Air Force.

Nothing in *Lockheed III* suggests the application of a different standard than what was applied before that decision, or that the quantum of proof in *Lockheed III* materially exceeded that found in earlier precedent. Indeed, neither the language nor the facts of the case show anything other than that *Lockheed III* is consistent with the principle that the Board's task upon review of a best value agency procurement is limited to independently determining if the agency's decision was grounded in reason. If this court wishes to alter such a longstanding principle, it will do so explicitly with supporting rationale.

Fulfilling its statutory duty under 41 U.S.C. § 607(e) (1988), the Board in this case reviewed the Air Force's procurement decision. The Board found that one non-quantified discriminator, the ALC co-location, did not have a rational basis. Except for this finding, the Board found no fault with the methodology of the SSA's decision. Just as in *Computer Sciences Corp.*, the Board here did not reject the procurement on the basis of one suspect discriminator, but continued its analysis with the offending discriminator factored out of its inquiry.

■ Although the SSA gave a reasoned explanation as to why he chose LOGTEC and Aries, the GSBCA did not defer to his reasonable decision. For example, the Board found fault with the SSA's emphasis on LOGTEC's and Aries' superiority over B3H in the software experience and data management experience non-quantified discriminators. The Board held that the record does not support the SSA's decision to emphasize these two discriminators over the others. Yet, weighing which non-quantified discriminator to emphasize in an analysis is exactly the type of decision the SSA is entrusted to make. As the Board does not require that every discriminator be assigned an exact dollar value, *TRW,* it necessarily must rely on an agency's judgment in giving disparate weight to the various non-quantified discriminators in a best value determination.

The Board should have followed its clear line of precedent and deferred to the reasonable decision of the SSA in this case. The Air Force's P/TTO Group developed seven discriminators and assessed how each of the offeror's proposals fared under those chosen criteria. Using his independent judgment and consistent with the solicitation's stipulation that cost was the least important factor for this contract, the SSA relied on this analysis and reasonably determined that the technical and managerial superiority of LOG-TEC's and Aries' proposals were worth the 15% and 8.8% higher cost. This case is no different from the many previous cases in which the GSBCA deferred to reasonable best value decisions made using substantially similar forms of analysis. Indeed, the SSA's concern that B3H's proposal might lead to excessive cost overruns seems no different from such recent explanations accepted by the Board in *ATLIS* (fear of cost overruns due to new technology) and *Titan* (fear of cost overruns due to subcontractor problems.) In reversing the GSBCA's grant of B3H's protest on the best value issue, we emphasize that the settled law remains settled.

## VI

We now turn to the cross-appeal. B3H filed its protest on April 18, 1994, asserting: "On information and belief, award was made to LOGTEC even though the Air Force knew, or should have known that there had been frequent and regular golf matches between Jerry George (the Air Force Program Manager) and M.H. Mynhier (President and CEO of LOGTEC) during the evaluation period." B3H's complaint made no mention of when it learned of these alleged improprieties. On May 18, 1994, the GSBCA granted

Air Force's motion to dismiss B3H's protest on this count because B3H had offered no evidence that it was pursuing a timely issue of protest. On May 19, 1994, B3H filed a motion for reconsideration of the Board's decision. Again, nowhere in the ten page argument supporting its motion did B3H acknowledge when it learned of these wrongdoings. After the Board denied B3H's motion for reconsideration on July 8, 1994, this cross-appeal followed.

We initially note that the merits of the impropriety issue are not before us. We thus do not assess whether the Air Force was correct in concluding, after an investigation, that no actual impropriety occurred during the golf matches. Nor do we decide if the appearance of impropriety was satisfactorily addressed when the Air Force removed the offending official from work on the contract.[4] Instead, the question on appeal is whether the Board erred in dismissing this count of B3H's protest as untimely filed. We thus focus on the Board's rules of practice, 48 C.F.R. Part 6101 (1994), which are designed to effectuate the fast-track nature of protest proceedings. *See* 40 U.S.C.A. § 759(f)(4)(B) (West Supp.1995) (requiring Board to issue its final decision no later than 65 days after protest is filed absent unusual circumstances); 48 C.F.R. § 6101.29(b) (1994) (stating that Board will usually issue protest decisions within 45 days after filing). The necessity of deciding protests in a timely fashion is especially vital because the Board has the authority to suspend an agency's procurement power under an existing contract pending a decision on the merits of the protest. *See* 40 U.S.C. § 759(f)(3)(B) (1988). Consequently, the need for parties to turn square corners to comply with the Board's rules is consistent with the GSBCA's statutory mandate of reaching an "expeditious, fair, and reasonable resolution of the protest." 40 U.S.C. § 759(f)(4)(A) (1988); *see also* 48 C.F.R. § 6101.1(d) (1994) (delineating similar goals).

■ On appeal, B3H asserts that its protest filed on April 18, 1994 was timely because it learned of the possible improprieties between Jerry George of the Air Force and LOGTEC personnel only after the contracts

were awarded. This assertion, however, does not inform us of the *date* on which B3H learned of the golf matches. The Air Force points to B3H's failure to follow the relevant Board rules of practice by failing to assert that date. Rule 5(b)(3)(ii) states: "A ground of protest ... shall be filed no later than 10 working days after the basis for the ground of protest is known or should have been known, whichever is earlier." 48 C.F.R. § 6101.5(b)(3)(ii) (1994). Additionally, the protest "shall include ... [a] statement of facts establishing that the protest complies with the timeliness requirements of [48 C.F.R. § ] 6101.5(b)(3)...." 48 C.F.R. § 6101.7(b)(2)(vii) (1994).

The Air Force argues that because B3H never stated when it learned of the alleged impropriety, B3H did not comply with its burden to plead the timeliness of its protest. We agree. To satisfy this burden, the GSBCA rules of practice quoted above in essence require the protestor to assert that: (1) he learned of the problem on date X; and (2) he filed the protest on date Y, which is 10 working days or less after date X. In both B3H's original complaint and in the motion for reconsideration, B3H simply failed to satisfy requirement (1) and B3H offers no satisfactory reason why it should be excused from compliance with the Board's procedural rules. We therefore affirm the finding of the GSBCA on the procurement integrity issue.

### VII

For the reasons stated above, we reverse the GSBCA's grant of B3H's protest on the best value issue and affirm the GSBCA's dismissal of B3H's protest on the procurement integrity issue. Accordingly, we remand this case to the GSBCA. We direct that B3H's protest be dismissed in its entirety and relief for LOGTEC and Aries be fashioned in a manner not inconsistent with this opinion.

*REVERSED–IN–PART, AFFIRMED–IN–PART, AND REMANDED.*

No costs.

---

4. On December 18, 1992, this official was fired   from the Air Force for other reasons.