HYDRO ENGINEERING, INC., Plaintiff,

v.

UNITED STATES, Defendant,

The Centech Group, Inc., Intervenor.

No. 96–564C.

United States Court of Federal Claims.

March 10, 1997 [1].

1. This opinion was originally issued and filed under seal on November 15, 1996. Since then the parties have reached agreement regarding what information contained in the court's original opinion is proprietary in nature and have submitted a proposed redacted opinion. This opinion reflects the redactions agreed to by the parties, and is being released for publication on this date.

Leon Rudloff, Metarie, LA, attorney of record, for plaintiff.

James W. Poirier, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were Sharon Y. Eubanks, Deputy Director, David M. Cohen, Director, and Frank W. Hunger, the Assistant Attorney General, attorneys of record, for defendant.

Paralee White, Cohen & White, Washington, DC, attorney, for the intervenor.

## OPINION

HORN, Judge.

The complaint in the above-captioned case was filed in this court on September 9, 1996. As originally submitted, the complaint had the names of Leon Rudloff, Esq., and Manfred Sternberg, Esq., typed below the words "Respectfully Submitted," but only Mr. Rudloff had signed the complaint. At the time the original complaint was submitted, Mr. Rudloff was not a member of the bar of the United States Court of Federal Claims, although he later perfected his admission. Subsequently, Mr. Sternberg, who was admitted to this court's bar, submitted a signed copy of the complaint in order to perfect it for filing.

In this government contract action, Hydro Engineering, Inc. (Hydro) seeks to prevent the award of a contract by the United States Army's Chemical and Biological Defense Command (CBDCOM) to the intervenor, The Centech Group, Inc. (Centech). In its complaint, plaintiff contends that the contracting officer acted in bad faith and that the decision to award the contract to other than the plaintiff was arbitrary and capricious and not in accordance with the law. Among many allegations, the plaintiff asserts that the defendant made the following errors during the procurement process: scoring and analytical errors on the technical and management areas of the evaluations of Hydro's proposal, failure to credit plaintiff points on its evaluation score for improvements included in its revised proposal, misevaluation of the proposal submitted by the prospective awardee, Centech, reliance on undisclosed evaluation criteria, and performing a flawed cost/technical tradeoff analysis. According to the plain-

tiff, the defendant contrived to deny an award to the plaintiff because of Hydro's suspected involvement with Delta Pacific Group, Inc. (Delta Pacific), a company which had bid on, and protested, a previous, related solicitation. In its complaint, plaintiff seeks a temporary restraining order (TRO), a preliminary injunction, and a permanent injunction, following a trial on the merits, to prevent the award of the contract to Centech, or to anyone other than the plaintiff. Plaintiff also has sued for bid preparation costs and for such other further relief as may be warranted.

Defendant responds by asking the court to deny plaintiff's request for injunctive relief prohibiting an award of the contract to Centech, to dismiss plaintiff's complaint, and to deny plaintiff bid preparation costs or other money damages. Defendant maintains that the selection of Centech for contract award was not arbitrary and capricious, and was grounded in reason. Furthermore, defendant maintains that Hydro has failed to demonstrate that the contracting officer acted in bad faith when selecting Centech. According to the defendant, Hydro has failed to establish entitlement to injunctive relief or to summary judgment, and has failed to identify any genuine issue of material fact to prevent the entry of summary judgment on the merits to the defendant.

The parties designated an administrative record on which the court, as agreed to early in the proceedings by the parties, bases its review of the agency's action. The defendant has stipulated that the agency will not award the contract until after November 16, 1996, in order to allow this court time to decide plaintiff's motions for a temporary restraining order, preliminary injunction, and permanent injunction, and to consider the parties' cross-motions for summary judgment.

### FACTS

In the procurement at issue, solicitation No. DAAM01–95–R–0073, the United States Army's Chemical and Biological Command (CBDCOM) requested proposals for the engineering development and production of the XM22 High Pressure Washer (HPW) for the decontamination of military equipment in the field, including removal of gross contaminants, such as mud, dirt, grease, or road film, and rinsing applied decontaminants. The CBDCOM, based at Aberdeen Proving Ground, Maryland, issued the request for proposals (RFP) to 39 firms, including Hydro and Centech, on September 27, 1995. Hydro is a Utah corporation with its principal place of business in Salt Lake City, Utah. Centech is a Virginia corporation, which maintains its corporate headquarters in Arlington, Virginia. The terms of the solicitation provided for two phases of work: an engineering phase, during which the contractor would be required to produce 32 XM22 prototypes, and a production phase, which would result in production of up to 1,965 XM22s.

Seven offerors submitted proposals by the January 2, 1996 due date.[2] After evaluation by a four-member government team, five offerors were found to fall within the competitive range: Centech, Hydro, SFA, Inc. (SFA), Engineering Technology, Inc. (ETI), and Robotics Systems Technology (RST). On February 20, 1996, following notifications of disadvantages and deficiencies to the offerors in the competitive range, each was given an opportunity to revise its proposal. The remaining offerors submitted best and final offers (BAFOs) on or before April 19, 1996. After the BAFO round of proposals, Hydro had the lowest price, but finished fourth in the merit rating. Centech had the second lowest price, and was tied for second in the merit rating. The evaluation committee and contracting officer determined that the proposals of Centech, SFA, and ETI offered comparable contributions to the government, that Centech's proposal was essentially equal in terms of merit to the highest-ranked proposal, and that Centech's higher merit rating and certain technical advantages outweighed Hydro's $876,809.42 lower price. Thus, the contracting officer concluded that Centech's proposal offered the best value to

---

**2.** The initial proposal submittal closing date was November 15, 1995. This date was subsequently amended and extended to January 2, 1996.

the government, and that Centech should be awarded the contract.

### Procedural History

Prior to bringing this action, Hydro filed a bid protest action with the General Accounting Office (GAO) challenging the procurement at issue in the above-captioned case. Because the offerors' proposals and the agency documents evaluating them contained proprietary information, the GAO entered its standard protective order applicable to all materials identified by any party as protected, unless GAO provided otherwise. As counsel for plaintiff, Leon Rudloff and Manfred Sternberg, applied for admission to the protective order. In addition, Andrew McPhate applied for admission to the protective order as a technical expert for the plaintiff.

On September 5, 1996, the GAO denied Mr. McPhate's application for admission to the protective order because it found that he had been a senior mechanical advisor to a company which was a proposed subcontractor to Delta Pacific. On a prior solicitation for the HPW, Delta Pacific had filed a bid protest action against the prior solicitation in the United States Court of Federal Claims, although that solicitation was subsequently canceled.

The GAO denied Manfred Sternberg's application for admission to the protective order. The GAO opinion stated:

> With regard to Mr. Sternberg, the record establishes that he has communicated with the agency on behalf of Delta concerning the procurement which is the subject of this protest. In his October 13, 1995, letter to the agency, Mr. Sternberg inquired about how Delta was to respond to and comply with various specifications in the solicitation. Further, Mr. Sternberg did not disclose this relationship in his application. Applicants are required to certify that they are not involved in competitive decision making on behalf of any firm that might gain a competitive advantage from access to the material disclosed under the protective order. Competitive decision

making includes product research and development and the composition of proposals. Based upon Mr. Sternberg's letter, we believe Mr. Sternberg was engaged in competitive decision making on behalf of Delta, a potential, if not actual competitor of Centech. On the basis of the information presented, we are unable to conclude that the risk of disclosure of protected information is sufficiently small to grant Mr. Sternberg's application to the protective order.

The GAO also noted that at the time it was reviewing Mr. Sternberg's application, Hydro already had retained another attorney, Marshall Doke,[3] who was admitted to the protective order on August 2, 1996.

Regarding Mr. Rudloff, the GAO granted his application for admission to the protective order. However, on September 5, 1996, the GAO revoked Mr. Rudloff's admission after finding that, in violation of the protective order, he had provided protected material to Mr. McPhate and another individual, neither of whom had been admitted to the protective order. Subsequently, at Hydro's request, the GAO protest was dismissed on September 12, 1996, after Hydro had initiated the above-captioned action in this court on September 9, 1996.

Hydro's complaint filed in this court seeks injunctive relief. Centech filed a motion to intervene, which the court granted, without objection from either the plaintiff or the defendant. Because all the parties acknowledged the existence of proprietary information in the case at bar, the court entered a protective order applicable to these proceedings. Defendant and the intervenor then raised the same issues regarding the admission of Mr. Sternberg and Mr. McPhate to this court's protective order, as those they had raised previously to the GAO. In the interest of advancing the instant litigation and also trying to accommodate plaintiff's choice of counsel, at least in part, the government waived its objection to admitting Mr. Rudloff to the protective order, despite the

---

**3.** Mr. Doke subsequently withdrew as counsel for Hydro prior to the date the first hearing was held in this court.

earlier revocation by the GAO of his access rights. The government, however, reiterated its objection to allowing Mr. Sternberg or Mr. McPhate access to the protected materials. The government's waiver regarding Mr. Rudloff was based on acknowledgment that Mr. Rudloff had already seen the proprietary material at issue during the time he had been admitted to the GAO protective order, and that, presumably, no further harm would occur from his admission to this court's protective order.

All the affected parties and individuals were given an opportunity to brief the issue of whether Mr. Sternberg should be admitted to the protective order in this court. After the briefing had been completed, the court, at Mr. Sternberg's request, held a hearing on September 24–25, 1996. The court heard live testimony from Mr. Sternberg and from Alan G. McCormick, Vice President of Hydro, and also heard oral argument. Based on the evidence and arguments presented, the court found a significant risk of disclosure or inadvertent disclosure due to Mr. Sternberg's existing and past, direct and indirect, relationships with individuals and companies involved in, or potentially involved in, the procurement at issue, or in future related procurements. In his application to the GAO, Mr. Sternberg had failed to disclose information requested by the GAO regarding his relationship with Delta Pacific and others, who were or might be involved with potential competitors in the instant or in related procurements. In fact, Mr. Sternberg had represented Delta Pacific during the formation of a proposal to be submitted in the procurement currently under review by this court. Mr. Sternberg's relationship with his brother and with another individual, Donald Little, who also is involved with counsel Sternberg's brother, and with Advanced Materials, another potential competitor, raises serious potential for inadvertent disclosure by Mr. Sternberg if he were granted access to the protected materials. Moreover, at the time of the hearing, Mr. Sternberg indicated an unwillingness to sever any future relationships with potential or future offerors on procurements related to the one at issue in the above-captioned case. Therefore, in a lengthy bench opinion, summarized in a brief written order, the court denied Mr. Sternberg admission to the protective order and access to materials covered by the protective order.[4] As

---

4. In its motion for summary judgment, plaintiff alleges that the court limited plaintiff's counsel's effectiveness in moving for summary judgment by denying Mr. Sternberg admission to the protective order, denying the assistance of experts, and allowing only limited discovery of agency documents. The court finds these allegations to be without merit. First, regarding the implication that effectiveness of counsel was limited because Mr. Sternberg was denied admission to the protective order, the court heard testimony addressing both Mr. Sternberg's and Mr. Rudloff's particular skills during the September 24–25 hearing. By his own admission, Mr. Sternberg is only somewhat familiar with procurement regulations. He also stated that although he had been involved in the protest of the previous, related solicitation, he could not remember much about it. In fact, Mr. Sternberg stated that he had handled four or five government contract cases, all in one way related to Delta Pacific, Advanced Materials, or Hydro. Mr. Sternberg also stated at the hearing that the skills he would have brought to the case were "general trial experience" which, presumably, any number of experienced practitioners could provide. That plaintiff chose to proceed without additional counsel once Mr. Sternberg was denied access to the protected materials is not the court's doing. In addition, any criticism of Mr. Rudloff's skills was confined to Mr. Sternberg and Mr. McCormick questioning Mr. Rudloff's skills as an oral advocate. Neither witness questioned Mr. Rudloff's ability to draft or respond to a motion for summary judgment. In order to prevent any disadvantage to plaintiff due to Mr. Rudloff's allegedly weak oral advocacy skills, the court granted plaintiff's motion for summary judgment to be heard on the record without oral argument and has continuously, since the inception of the case, granted requests for extensions of time to file and refile documents, on the assumption that Mr. Rudloff was substantially without Mr. Sternberg's assistance.

Regarding plaintiff's request to obtain the assistance of experts, the court determined that expert assistance was not needed to review the administrative record and the claims raised. The court also noted the agreement of the parties to proceed at this juncture of the case on the administrative record, and found that allowing expert assistance or testimony would unnecessarily prolong the litigation regarding plaintiff's claims for preliminary injunctive relief.

Finally, regarding plaintiff's allegation that the court allowed only limited discovery, the court denied plaintiff's motion for a subpoena *duces tecum* or motion to compel based on defendant's counsel's representation in court that all docu-

suggested and agreed to by the government, Mr. Rudloff, as counsel of record, was given full access to the protected materials.

### Evaluation of Proposals

The solicitation for the XM22 High Pressure Washer provided that an award would be made, as follows: "to the responsible offeror whose proposal presents the best value to the Government as determined by the evaluation described below. Accordingly, the Government may award any resulting contract to other than the offeror proposing the lowest price or other than the offeror achieving the highest merit rating." Section M of the solicitation, which discussed evaluation factors for award, identified the following areas and factors that the government would consider in determining an award:

 a. Technical Area
 1) Proposed Design
 2) Verification
 3) Quality Assurance
 b. Management Area
 1) Related Experience
 2) Program Management
 3) Manufacturing Capabilities
 4) Schedule
 c. Price
 d. Performance Risk Assessment

Under the solicitation, the technical and management areas, and each of the factors under them, would receive a narrative review and a numerical score, and the scores would then be combined to yield a merit rating for each proposal. Price and the performance risk assessment would receive a narrative evaluation.

The factors were listed in order of importance, i.e., the combined merit rating was to be more important than price, and price was to be more important than performance risk. According to the solicitation:

The Government's primary concerns for this acquisition are technical and manage-

ment factors. Accordingly, we are willing to pay more if an increase in technical or management capabilities so warrants. However, price and performance risk may become more significant in the event that competing Merit Ratings are closely grouped and offer comparable merit contributions to the Government.

The solicitation further instructed the offerors that their proposals must "describe how the proposed system meets the requirements of the performance specification."

The evaluation team scored both the initial and revised proposals according to a competitive evaluation plan, which was not released to the offerors. The evaluation plan scored the merit rating on a 200–point scale, distributing the points available under each of the seven factors listed in the RFP, as follows:

Technical Factors:

| | |
|---|---|
| Proposed Design | 90 points |
| Verification | 10 points |
| Quality Assurance | 10 points |

Management Factors:

| | |
|---|---|
| Related Experience | 40 points |
| Program Management | 20 points |
| Manufacturing Capabilities | 20 points |
| Schedule | 10 points |

In accordance with the solicitation, the team also provided a narrative discussion to support the scores awarded. The narrative evaluation listed advantages, disadvantages, and deficiencies in each proposal.

The initial merit ratings of the five offerors in the competitive range, out of a possible 200 points, were: Centech, 182; Hydro, 176; SFA, 151; ETI, 125; RST, 102. The narrative evaluation of proposals identified the following strengths and weaknesses in Centech's and Hydro's original proposals, as follows:

| | Advantages | Disadvantages | Deficiencies |
|---|---|---|---|
| Centech | 17 | 7 | 0 |
| Hydro | 10 | 10 | 2 |

ments and relevant e-mail from the applicable time period were included in the administrative record. The court also issued an order disallowing plaintiff's motion, made after the briefing on the cross-motions for summary judgment had been completed, to take seven depositions prior

to the issuance of this opinion, based on the agreement of the parties to proceed on the administrative record, the risk of delay to these proceedings, and the fact that plaintiff had already been provided voluminous records to prepare for this case and the earlier GAO case.

The initial evaluation of the proposals also called for a number of clarifications to be addressed by each of the parties, including Hydro and Centech.

On February 20, 1996, CBDCOM sent each offeror in the competitive range a letter listing the disadvantages and deficiencies found in its proposal, and gave each offeror an opportunity to revise its proposal. Technical and price discussions were held with Hydro, Centech, and the other offerors, and they each submitted revised technical proposals. Centech provided a revised proposal on March 27, 1996. Hydro provided a revised technical proposal on March 28, 1996. Best and final offers were submitted by the offerors on or before April 19, 1996.

The evaluation committee reviewed each revised proposal and gave the following final merit scores to Centech and Hydro:

| | | Centech | | Hydro | |
| Factor | Max Score | Initial | Final | Initial | Final |
| --- | --- | --- | --- | --- | --- |
| **Technical** | | | | | |
| 1. Design | 90 | 80 | 90 | 85 | 85 |
| 2. Verification | 10 | 10 | 10 | 8 | 10 |
| 3. QA | 10 | 9 | 10 | 10 | 10 |
| Subtotal | 110 | 99 | 110 | 103 | 105 |
| **Management** | | | | | |
| 1. Experience | 40 | 35 | 35 | 38 | 38 |
| 2. PM | 20 | 18 | 20 | 15 | 17 |
| 3. Manufacturing | 20 | 20 | 20 | 15 | 20 |
| 4. Schedule | 10 | 10 | 10 | 5 | 7 |
| Subtotal | 90 | 83 | 85 | 73 | 82 |
| **TOTAL SCORE** | 200 | 182 | 195 | 176 | 187 |

Hydro did not receive full credit for the environmental conditions criteria under the Design component, and also lost points for Related Experience, Program Management, and Schedule. As reflected above, Centech did not receive full credit on its merit rating

for Related Experience, but did receive full credit for the other factors.

In the narrative, the evaluation committee concluded that: Hydro's proposal, as revised, "contains no significant disadvantages or deficiencies and has been determined to be technically acceptable. It is the recommendation of the ad hoc evaluation committee that this offeror remain within the competitive range." The committee's report also noted that Hydro's revised proposal had nine advantages—four in Design, one in Verification, one in Quality Assurance, one in Related Experience, one in Manufacturing Capability, and one in Schedule.

The committee found that Hydro had corrected a number of deficiencies and disadvantages from the initial proposal, and increased Hydro's overall score eleven points, from 176 to 187. Specifically, the committee determined that Hydro had corrected four of the five disadvantages noted in the Design portion of the initial proposal. These corrected disadvantages were: 1) providing an electrical schematic of the proposed design, 2) identifying personnel assigned to the effort, 3) demonstrating familiarity with military methods of determining reliability and maintainability, and 4) demonstrating the durability of the shower bar. The committee recommended an increase for each of these corrections except the third one, familiarity with military methods of determining reliability and maintainability. The evaluation committee also did not recommend an increase for the fifth disadvantage in the Design area noted on Hydro's proposal, regarding environmental conditions criteria.[5] The evalua-

---

5. The performance specification contained a section on environmental conditions which required the HPW to operate under the following environmental conditions:

**3.3.7.1 *Operating Conditions.*** The HPW shall be capable of operation at temperatures from −25° F. to 120° F. and relative humidity from 5% to 100%.
**3.3.7.2 *Storage Temperature.*** The HPW shall be capable of operation after being stored for a minimum of 72 hours at temperatures of −50° F. and 160° F., relative humidity uncontrolled.
**3.3.7.3 *Environmental Factors.*** Environmental conditions shall include the following weather factors.

(a) Solar radiation—solar radiation with an intensity of 1120 $W/m^2$ Expected duration of seven days.
(b) Sand and Dust—dust particles smaller than 100 mesh blown by winds of 1750 ft/min (8.9 m/s). Expected duration for this condition is 12 hours.
(c) Rain—rain drops of size between .5 mm and 4.5 mm, blown by winds of 40 mph (18 m/s).
(d) Salt Fog—salt fog with a salt concentration of 5% ± 1%. Expected duration for this condition is 96 hours.
(e) Temperature Shock—temperature shock with a maximum temperature of 70° degrees F. and a minimum temperature of −50° degrees F.

tion committee commented: "The offeror provided only a general discussion of their engineering solution to meeting the extreme environmental conditions listed in performance specification paragraph 3.3.7.1 and 3.3.7.3." Despite the improvements and the narrative report's recommendations for increases, the evaluation committee did not increase Hydro's rating in the Design area.

The evaluation committee, however, did increase Hydro's score from 5 to 7 points out of 10 for the Schedule factor. The committee previously had found two deficiencies for this factor. Both deficiencies were corrected so that they were no longer considered deficiencies, but one was still considered by the committee to be a disadvantage. The remaining Schedule disadvantage concerned the phase II GANTT chart, required under the solicitation to show "all contract deliverables, schedule of events, work phases, significant milestones to be accomplished, and the critical path." The committee reported that the phase II GANTT chart in Hydro's revised proposal "shows only a general delivery schedule of 210 units per quarter. The GANTT chart should have shown the delivery of 70 units per month. The GANTT chart does not show PQT, fabrication, assembly, and inspection tasks." The committee report also noted a remaining disadvantage under the Related Experience factor: "[a] majority of the offeror's previous experience is with GSA purchase orders and the proposed XM22 HPW effort is larger in scope than these previous efforts;" and "Hydro has limited related experience with military development contracts." Regarding the Program Management factor, the committee also found minor disadvantages in Hydro's proposal.

(f) High Humidity—Relative humidity ranging from 74% to 100%. Expected duration is 12 days.

6. As noted above, the solicitation also required that a performance risk assessment be conducted. Both Centech and Hydro received a low to moderate risk rating. Hydro has not challenged either risk rating.

7. The BAFO prices of the offerors who were not parties to this action have been redacted.

Centech's revised proposal was found to be technically acceptable, with no significant disadvantages or deficiencies. The committee found that Centech had corrected all disadvantages identified in the initial proposal except for the one on Related Experience, on which the evaluators still identified a minor disadvantage. As a result, the committee increased Centech's overall merit score 13 points from 182 to 195. The evaluation report identified nineteen (19) advantages in Centech's proposal to Hydro's nine advantages, eight in design, two in Verification, one in Quality Assurance, one in Related Experience, one in Program Management, five in Manufacturing Capability, and one in Schedule. In sum, the following strengths and weaknesses were identified in the revised proposals:

| | Advantages | Disadvantages | Deficiencies |
|---|---|---|---|
| Centech | 19 | 1 | 0 |
| Hydro | 9 | 4 | 0 |

The BAFO prices submitted by the offerors, and the final merit rating scores [6] were as follows:

| Offeror | Price | Merit Score |
|---|---|---|
| Centech | $20,676,222.92 | 195 |
| Hydro | $19,799,413.50 | 187 |
| SFA [7] | | 195 |
| ETI | | 200 |
| RST | | 152 |

The evaluation committee and the contracting officer considered the proposals of Centech, SFA, and ETI essentially equal in terms of benefit to the government. ETI was the only offeror to receive a perfect merit rating score. Both Centech and SFA did not receive perfect scores for merit rating, each losing 5 points because they lacked related experience on a production effort of similar scope, but the committee considered this to be a minor disadvantage, and was convinced both could perform the effort required.[8] Although Hydro had the lowest

8. The committee's Technical & Price Tradeoff Analysis Report states:

C. CENTECH, ETI, and SFA's proposals are closely grouped in the merit rating and offer comparable contributions to the government. Out of a maximum 200 points, ETI's proposal received 200 points, and CENTECH and SFA's proposals received 195 points. CENTECH and SFA both lost 5 points out of 40 in the Related Experience factor. This was based on the fact that neither CENTECH nor SFA has experience performing on·an effort of

price, it finished fourth in the merit rating. Centech had the second lowest price, and was tied for second in the merit rating.

The evaluation committee conducted a cost/technical tradeoff analysis, in order to determine whether the benefits of Centech's proposal were worth the $876,809.42 price differential over Hydro's lower cost proposal. Concerning Centech's proposal, the committee noted that "Centech's proposal contained numerous technical advantages that would be beneficial to the Government and only one minor disadvantage in the Related Experience area concerning their limited experience in a production effort of comparable scope," and that "Centech received a perfect score in all other evaluation factors including the Proposed Design area."

Concerning Hydro's proposal, the committee stated in its cost/technical trade-off analysis that Hydro's proposal also contained some technical advantages. However, the proposal still contained five disadvantages, which the committee discussed as follows:

> One of HYDRO's disadvantages was in the most important technical evaluation element, Proposed Design. In the Proposed Design area, HYDRO provided only a general discussion of their engineering solution to meeting the extreme environmental conditions listed in the performance specification. This indicates an increased risk that their proposed design will not be able to operate at the extreme environmental conditions required by the XM22 specification. HYDRO's next two disadvantages were in the related experience area: (1) A majority of HYDRO's previous experience is with GSA purchase orders and this effort is larger in scope than HYDRO's previous efforts, and (2) Hydro has limited related experience with United States Army development contracts.... These two disadvantages indicate an increased risk that HYDRO will not be able to perform the effort within the program schedule. HYDRO's next disadvantage was in

the Program Management area, they did not discuss their method for tracking and controlling expenditures. This disadvantage indicates an increased risk that HYDRO will not be able to adequately manage their expenditures for this effort. HYDRO [sic] final disadvantage was in the Schedule area, their GANTT chart does not show PQT, fabrication, assembly, and inspection tasks. This disadvantage makes it difficult for the Government to adequately evaluate HYDRO's ability to perform this effort.

The tradeoff analysis concluded that Centech's technical advantages and higher merit rating offset the $876,809.42 price difference between Centech and Hydro. The committee recommended to the contracting officer that Centech be selected for award, based upon the committee's conclusion that Centech's proposal offered the best value to the government.

The contracting officer completed and signed the Source Selection and Best Value Determination Memorandum on May 30, 1996. The memorandum listed documents the contracting officer relied upon in reaching her decision and summarized the assessment of proposals as follows:

> 8. **Summary of Integrated Assessment:** As stated in M.11.1 of the solicitation, the merit rating is more important than price or performance risk. However, price and performance becomes more significant in the event competing proposals are determined essentially equal in the merit rating. For this acquisition, the three highest merit rating proposals were determined essentially equal and accordingly, price became more significant. Of the three essentially equal proposals, Centech offered the best price along with significant technical advantages not presented by the other offerors. In addition, Centech received a favorable PRAG evaluation that indicated low risk for unsuccessful performance under

similar scope to the phase II production effort. This is considered a minor disadvantage due to the fact that both CENTECH and SFA have provided detailed plans that indicate their ability to perform this effort. All three offerors' proposals received the maximum merit rating

for all other merit factors and provided many advantages which were desirable to the Government. Based on the small difference in merit rating (5 points) CENTECH, ETI, and SFA's proposals are considered essentially equal in technical merit.

this contract. The integrated assessment of all the factors involved with this evaluation can be summarized as follows:

 a. Merit Rating: Centech's proposal is determined to be equal to or greater than the other four offerors in the merit rating evaluation which is the most important evaluation factor in this procurement.

 b. Price: Centech's proposal is the lowest offer among the three that were determined essentially equal and Centech's proposal is the second lowest price among all five submitted. A tradeoff analysis indicates that Centech's technical advantages and higher merit rating warrants the $876,809.42 difference between Centech and the lowest offeror, Hydro. Therefore, Centech's proposal is determined to represent the best value to the Government.

 c. PRAG: Centech's proposal is determined to represent low to moderate Performance risk for this acquisition. No findings were revealed that would indicate any reason to preclude Centech from an award.

**9. Conclusion:** Based on the above information, I hereby determine that award of contract DAAM01-96-C-0031 should be made to The Centech Group, as the responsible offeror whose proposal represents the best value to the Government for this acquisition.

The agency notified the offerors that Centech was the "apparently successful offeror," in a letter dated June 17, 1996.

### DISCUSSION

■ Plaintiff has filed its complaint in the above-captioned case as a disappointed bidder in a pre-award case. In such cases, there is no express contract to review. *Dynalectron Corp. v. United States,* 4 Cl.Ct. 424, 428, *aff'd without op.,* 758 F.2d 665 (Fed.Cir.1984); *Heyer Prods. Co. v. United States,* 135 Ct.Cl. 63, 140 F.Supp. 409, 412 (1956). Instead, jurisdiction arises from an alleged breach of an implied contractual condition that each responsible, responsive bid to a solicitation received by the government will be honestly and fairly evaluated. *E.W. Bliss Co. v. United States,* 77 F.3d 445, 447 (Fed.Cir.1996) (quoting *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir.1983) (en banc)); *Central Arkansas Maintenance, Inc. v. United States,* 68 F.3d 1338, 1341 (Fed.Cir.1995); *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 909 (Fed.Cir.1988); *National Forge Co. v. United States,* 779 F.2d 665, 667 (Fed.Cir.1985); *CACI, Inc.–Federal v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983); *Skytech Aero, Inc. v. United States,* 26 Cl.Ct. 251, 253–54 (1992).

■ As a disappointed bidder, Hydro has brought suit for an alleged breach of the Army's implied-in-fact contract to treat Hydro's bid honestly and fairly. As stated in *Coastal Corp. v. United States,* 713 F.2d 728 (Fed.Cir.1983), the theory for the alleged breach is that:

> the government had breached an implied contract, obligating it 'to treat a bid honestly and fairly,' because its 'conduct was arbitrary and capricious toward the bidder-claimant.' *See, e.g., Keco Indus., Inc. v. United States,* 492 F.2d 1200, 1203, 1205, 203 Ct.Cl. 566 (1974); *Heyer Prod. Co. v. United States,* 140 F.Supp. 409, 413–14, 135 Ct.Cl. 63 (1956).

*Id.* at 730. Otherwise stated, "[a] breach occurs in such situations if the contracting agency acts in an arbitrary and capricious, *i.e.,* irrational or unreasonable, manner in rejecting the bid." *NKF Eng'g Inc. v. United States,* 805 F.2d 372, 376 (Fed.Cir.1986) (citations omitted). Consequently, given the facts presented to the court, the court must consider whether the Army acted arbitrarily, capriciously, or not in accordance with law when it selected Centech as the apparently successful offeror, and whether the plaintiff has demonstrated that injunctive relief is proper.

■ Pursuant to 28 U.S.C. § 1491(a)(3), this court has authority to grant injunctive relief in appropriate pre-award cases in order to ensure that the procurement process has been conducted honestly and fairly, that each bid has been honestly and fairly considered, and that there has been no arbitrary or

capricious behavior on the part of the government agency or the contracting officer. *John C. Grimberg Co.*, 702 F.2d at 1367; *see also National Forge Co. v. United States*, 779 F.2d at 667; *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859, 869 (D.C.Cir.1970); *Prineville Sawmill Co. v. United States*, 859 F.2d at 909; *CACI, Inc.–Federal v. United States*, 719 F.2d at 1574–75; *Keco Indus., Inc. v. United States*, 192 Ct.Cl. 773, 780, 428 F.2d 1233, 1238 (1970) (*Keco I*).

■ The court, however, should not select a contractor or award specific performance of a contract. In *Scanwell Laboratories v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970), the court stated that "[i]t is indisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties," and that, "[i]t is also incontestible that that discretion may not be abused." *Id.* at 869. In *Parcel 49C Limited Partnership v. United States*, 31 F.3d 1147, 1152 (Fed.Cir. 1994), the United States Court of Appeals for the Federal Circuit quoted from, and endorsed, the *Scanwell* decision. The applicability. to the Claims Court of the doctrine which acknowledges agency discretion in the award of a contract is also well established. *See id.* at 1152; *CACI v. United States*, 719 F.2d at 1574; *Unified Indus., Inc. v. United States*, 24 Cl.Ct. 570, 575 (1991); *Arrowhead Metals, Ltd. v. United States*, 8 Cl.Ct. 703, 711 (1985).

■ The plaintiff and defendant have each filed cross-motions for summary judgment. The intervenor has filed a motion for partial summary judgment, which addresses only some of the allegations raised by plaintiff, Hydro. Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the United States Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.)

and is similar in language and effect.[9] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Rule 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id.; see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

■ When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd without op.*, 937 F.2d 622 (Fed.Cir. 1991). The judge must determine whether

9. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Sec'y DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l. Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld–Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. at 2511–12. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present the evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552; *Lima Surgical Assocs.*, 20 Cl.Ct. at 679.

Pursuant to Rule 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Generally, however, in order to prevail, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions, in order to demonstrate that a genuine issue for trial exists. *Id.*

■■ In the case at bar, cross-motions for summary judgment have been filed. The fact that all parties argue in favor of at least partial summary judgment, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *Lew-Ron Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 322 (1993), *aff'd without op.*, 31 F.3d 1176 (Fed.Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc. v. United States*, 812 F.2d at 1391.

■■ In order to determine whether Hydro is entitled to the unusual measure of injunctive relief for an alleged breach of the government's duty to treat the bids of all

offerors honestly and fairly, this court must examine the following four factors:

(1) Whether there is a reasonable likelihood that Hydro will prevail on the merits of its complaint;

(2) Whether Hydro will suffer irreparable harm if the injunction is not granted;

(3) Whether the balance of hardships on plaintiff and defendant tips in Hydro's favor;

(4) Whether a preliminary injunction will not be contrary to the public interest.

*FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993); *see also Bio–Technology General Corp. v. Genentech, Inc.,* 80 F.3d 1553 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 274, 136 L.Ed.2d 197 (1996); *Reebok Int'l Ltd. v. J. Baker Inc.,* 32 F.3d 1552, 1555 (Fed.Cir.1994); *Compliance Corp. v. United States,* 22 Cl.Ct. 193, 199 (1990), *aff'd without op.,* 960 F.2d 157 (Fed.Cir. 1992); *TRW Envtl. Safety Sys. v. United States,* 18 Cl.Ct. 33, 72 (1989).

Furthermore:

No one factor, taken individually, is necessarily dispositive. If a preliminary injunction is granted by the trial court, the weakness of the showing regarding one factor may be overborne by the strength of the others. If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.

*FMC Corp. v. United States,* 3 F.3d at 427 (citing *Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.,* 908 F.2d 951, 952 (Fed. Cir.1990)). Although all four factors are important, the court should first consider whether Hydro is likely to succeed on the merits of its complaint, prior to deciding whether it is necessary to consider the remaining three factors. *See Compliance Corp. v. United States,* 22 Cl.Ct. 193 (1990).

■ The decision of whether or not to grant preliminary relief is within the discretionary authority of the trial judge, and, if a request for preliminary injunction is denied, the applicant faces a heavy burden to show that the trial judge abused his/her discretion, committed an error of law, or seriously mis-

judged the evidence. *FMC Corp. v. United States,* 3 F.3d at 427. The discretionary latitude of the trial court, of course, is not absolute and should be undertaken consistent with the standards for granting injunctive relief.

■ "It is well-established that contracting officials are accorded broad discretion in conducting a negotiated procurement...." *Hayes Int'l Corp. v. United States,* 7 Cl.Ct. 681, 686 (1985) (citing *Sperry Flight Sys. v. United States,* 212 Ct.Cl. 329, 339–40, 548 F.2d 915, 921 (1977)). Stated otherwise:

Effective contracting demands broad discretion. *Burroughs Corp. v. United States,* 617 F.2d 590, 598 [223 Ct.Cl. 53] (1980); *Sperry Flight Sys. Div. v. United States,* 548 F.2d 915, 921, 212 Ct.Cl. 329 (1977); *see NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 377 (Fed.Cir.1986); *Tidewater Management Servs., Inc. v. United States,* 573 F.2d 65, 73, 216 Ct.Cl. 69 (1978); *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 819 (1989), *aff'd,* 914 F.2d 271 (Fed.Cir.1990). Accordingly, agencies 'are entrusted with a good deal of discretion in determining which bid is the most advantageous to the Government.' *Tidewater Management Servs.,* 573 F.2d at 73, 216 Ct.Cl. 69.

*Lockheed Missiles & Space, Co. v. Bentsen,* 4 F.3d 955, 958–59 (Fed.Cir.1993). In *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590 (1980), the court also offered a clear summary of the broad discretion afforded a contracting officer in a negotiated procurement, as follows:

Remarking on the contracting officer's discretion in negotiation the court in *Sperry Flight Systems Division v. United States,* 212 Ct.Cl. 329, 339, 548 F.2d 915, 921 (1977) noted that '... the decision to contract—a responsibility that rests with the contracting officer alone—is inherently a judgmental process which cannot accommodate itself to absolutes, at least not without severely impairing the quality of the judgment called for ...' and that, 'effective contracting demands broad discretion.' Because of the breadth of discretion given to the contracting officer in negotiated procurement, the burden of showing

this discretion was abused, and that the action was 'arbitrary and capricious' is certainly much heavier than it would be in a case of formal advertising. *See Keco II,* 203 Ct.Cl. [at] 574, 492 F.2d at 1204.

*Id.* at 65, 617 F.2d at 598.

 The court's review of a plaintiff's claim for injunctive relief in a disappointed bidder case, therefore, is narrow and should be undertaken cautiously with a high degree of respect for the agency's decision-making process, because contracting officers may exercise wide discretion when they conduct the bid evaluation process, including whether a proposal is technically acceptable. *Continental Business Enters. v. United States,* 196 Ct.Cl. 627, 637, 452 F.2d 1016, 1021 (1971); *Compubahn, Inc. v. United States,* 33 Fed. Cl. 677, 683 (1995); *RADVA Corp. v. United States,* 17 Cl.Ct. 812, 818 (1989), *aff'd without op.,* 914 F.2d 271 (Fed.Cir.1990); *see also Lockheed Missiles & Space Inc. v. Bentsen,* 4 F.3d 955, 958–59 (Fed.Cir.1993). Interference with the procurement process by the courts should be rare and the exercise of injunctive powers to do so should occur only in "extremely limited circumstances." *John C. Grimberg Co.,* 702 F.2d at 1372; *see also NKF Eng'g v. United States,* 805 F.2d at 376; *CACI, Inc.–Federal,* 719 F.2d at 1581; *Magnavox Elec. Sys. Co. v. United States,* 26 Cl.Ct. 1373, 1380 (1992). "Because of the broad discretion vested in the contracting officer to determine whether a proposal is technically acceptable, plaintiff has an unusually heavy burden of proof in showing that the determination made in this regard was arbitrary and capricious." *Continental Business Enters. v. United States,* 452 F.2d at 1021. Stated otherwise, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983); *Skytech Aero, Inc.,* 26 Cl.Ct. at 254; *Magnavox Elec. Sys. Co. v. United States,* 26 Cl.Ct. at 1380.

 The plaintiff must establish by "clear and convincing evidence" that the agency's determination was unreasonable or irrational. *TRW Environmental Safety Sys., Inc.,* 18 Cl.Ct. at 43 (citing *DeMat Air, Inc. v. United States,* 2 Cl.Ct. 197, 202 (1983)). "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971); *Southwest Marine, Inc. v. United States,* 3 Cl.Ct. 611, 613 (1983).

 The Court of Claims in *Keco Industries, Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974) (*Keco II*), set forth four factors to be considered when determining whether the government has acted arbitrarily or capriciously towards a bidder-claimant: 1) whether there was subjective bad faith on the part of the procuring officials, thus depriving the bidder of fair and honest consideration of its proposal; 2) whether there was a reasonable basis for the administrative decision; 3) the degree of discretion given to the procurement officials by applicable statutes and regulations which, under *Keco II,* determines the degree of proof of error necessary to demonstrate a right to recovery; and 4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the basis for recovery, but need not do so automatically. *Id.* at 574, 492 F.2d at 1203–04; *see also E.W. Bliss Co. v. United States,* 77 F.3d at 447; *Burroughs Corp.,* 223 Ct.Cl. 53, 617 F.2d 590 (1980) (applying *Keco II* criteria).

Plaintiff's rambling and broad accusations of arbitrary and capricious conduct by government officials, contained in its complaint, amplified on the numerous status conferences, and in the briefs and documents, filed and refiled by plaintiff, are not always clear, sometimes overlap, and appear to number approximately three dozen. Generally, plaintiff's allegations may be characterized, in broad categories, as attacking the scoring of Hydro's proposal, the evaluation of Centech's proposal, the evaluation factors considered by the agency, and the methodology of the agency's cost/technical tradeoff analysis, contained in the Technical & Price Tradeoff

Analysis Report. Plaintiff also alleges statutory violations and points to alleged discrepancies in the administrative record as evidence of bad faith. Although the court will attempt to consider plaintiff's allegations comprehensively, some of the allegations are difficult to discern, and others, such as lack of meaningful discussions, were raised for the first time in plaintiff's motion for summary judgment or reply brief, and were not briefed. Moreover, just because the plaintiff chose to characterize various actions of the defendant using emotional terminology does not mean that the defendant has committed egregious behavior. The harsh, accusatory tone of some of plaintiff's filings is considered irrelevant to the outcome of the case.

First, plaintiff asserts that the agency improperly scored its proposal by not increasing its initial score in the Design area after the plaintiff had corrected various disadvantages identified in the initial evaluation of the proposals, and that the agency should have awarded plaintiff higher scores in the Schedule and Related Experience areas. Hydro argues that the evaluation report indicates that Hydro corrected four out of five Design disadvantages in its revised proposal, that the evaluation committee recommended that Hydro's merit rating be increased for the corrections made, but that the committee did not raise Hydro's score in the Design area. In contrast, according to plaintiff, Centech's corrections in the Design area were all credited with increased scores. Although Hydro's score in the Design area was not increased, despite the committee's recommendation in the narrative to do so, the recommended increases were for only three of plaintiff's four corrections in the Design area. In contrast, the initial evaluation of Centech's original proposal had identified only three disadvantages in Design, and the committee recommended an increase for all three corrections following receipt of the revised proposal, including a four-point increase for one Design correction, for a total of a 10-point increase in the Design area.

■ Specifically, Hydro complains that it should not have received a disadvantage rating for the one Design disadvantage identified by the evaluators in Hydro's revised proposal regarding plaintiff's ability to meet the extreme environmental conditions listed in the performance specification. As set forth above, specification paragraphs 3.3.7.1 through 3.3.7.3 required the HPW to withstand certain extremes in temperature, humidity, solar radiation, sand and dust, rain, and salt fog. In addition, paragraph L.26.1.2 required each offeror to describe how the proposed system would meet the requirements of the performance specification. After Hydro was informed of this disadvantage rating for the environmental factor, Hydro revised its proposal, which is quoted in its entirety, as follows:

The XM22 will be able to operate at the contract required environmental conditions because the component parts have been tested by the manufacturers at the specified environmental extremes. Only parts that can meet the temperature ranges called out for in the contract requirements have been selected by Hydro. Furthermore, Hydro has included in its design a lightweight chemically resistant flytarp for covering the XM22 system while it is in storage and for use in operation. The flytarp can be partially opened along its seams for operational use to restrict environmental elements that could be damaging to the system. Hydro has a history of operated high pressure washer systems in temperature extremes approaching the contract requirements that supports Hydro's assertions. This coupled with vendor data *leads Hydro to believe* that the system will be capable of operating under the contract environmental conditions. The Flytarp also provides a [sic] insulation effect for the system operation by reducing the dissipation of heat from the operation of the diesel engine. This heat will ensure a warmer temperature within the tarped frame than the external environmental temperatures.

The flytarp will be constructed of a chemical resistant laminated material named Tedlar, manufacture by Dupont. This material has been tested against VX, GB, and TGD and provides a vapor barrier for an extended period of time, and is compatible with decontaminating agents such as DS2. The Tedlar material can withstand low and

high temperatures in excess of contract requirements. A physical data sheet will be provided after award.

(Emphasis added.) Following the revision, however, the evaluators still found that Hydro had "provided only a general discussion of their engineering solution to meeting the extreme environment conditions listed in performance specification paragraph 3.3.7.1 and 3.3.7.3."

In contrast, Centech received full credit for its discussion of its ability to meet environmental conditions. Centech's more comprehensive discussion first addressed operation of its system in extreme temperatures, and then, specifically, addressed the other environmental conditions in paragraph 3.3.7 of the solicitation as follows: [10]

The clear difference in the quality and comprehensiveness of the responses submitted by Hydro and Centech to the environmental conditions requirement demonstrates that there was a reasonable basis for the evaluators' decision to give Centech full credit and to continue to score Hydro with a disadvantage in this area. Even if Hydro is correct that its HPW can meet the environmental conditions requirement, and even if it could now prove so with the submission of additional documentation, the agency officials did not abuse their discretion when they concluded that the information included in Hydro's proposal was inadequate to justify giving Hydro's proposal full credit in this area. Although this court believes that there are situations in which the court might review and disagree with an evaluation committee on its technical evaluations, in this case, the evaluators appear to have acted reasonably when they did not raise Hydro's score and questioned plaintiff's ability to demonstrate that its product could handle the extreme environmental conditions specified in the solicitation. *See Compubahn v. United States,* 33 Fed.Cl. at 682.

Despite plaintiff's protestations that the evaluators acted unreasonably when they did not raise Hydro's merit scores for its corrections of Design disadvantages, Hydro's final total Design score also appears to be justified. The environmental conditions requirement was an important part of the XM22 design requirements. The first paragraph in the performance specification states that the HPW must operate in the field "under various climatic conditions." Elsewhere, the solicitation requires that the XM22 prototypes be tested in diverse climates, including Alaska, Arizona, and Panama. Given the importance of the environmental conditions requirement, the agency had a reasonable basis to justify Hydro's final score of 85 design points out of 90 for its revised proposal, without revising plaintiff's score. Furthermore, the court notes that in the initial evaluation of proposals, although Hydro had been marked down only five points for its five Design disadvantages, Centech had been marked down ten points for only three Design disadvantages.[11] Given these disparate initial scores, on balance, the court cannot conclude that the committee's failure to increase Hydro's score for its revised proposal showed bad faith, or lacked a reasonable basis.

Although there may have been a failure to have totally commensurate scoring responses to the corrections the evaluation committee acknowledged had been made in Hydro's revised proposal, and the scoring revisions for other proposals, it is difficult to find fault with the evaluators' final conclusions because the requirements or elements which the eval-

---

**10.** Centech's discussion of the environmental conditions has been redacted.

**11.** Defendant also suggests that the agency may have made a mistake by not marking Hydro down more in the first evaluation, as follows:
Ironically, Hydro's own brief highlights the most likely explanation for the scoring results. In the initial design evaluations, 'Hydro had five disadvantages in the design area, Centech had three.' Nonetheless, Hydro was only marked down 5 points, while Centech (with half as many disadvantages) was marked down

*10 points.* Was this a conspiracy against Centech? Or did the evaluation team make a mistake by not marking Hydro down more in the first evaluation? We cannot know with certainty from the administrative record, but, presumeably [sic], the Army's authority to make a contract award for sophisticated equipment does not depend upon the answer to such questions. The minutiae of merit ratings are properly left to the *honest* discretion of procurement officials.

uators considered within the design factor were not assigned individual points. Nor is there any requirement for the agency to publish a detailed scoring sheet. It is clear, however, from the record that even after plaintiff revised its proposal, the evaluators considered Hydro's remaining Design disadvantage to be significant when compared to the scores and narrative comments received by Centech.[12]

■ Technical ratings are aspects of the procurement process involving discretionary determinations of procurement officials which a court should not second guess. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir.1996). The court of appeals has adopted a "grounded in reason standard" to review an agency decision to accept a higher cost proposal "as the best value to the government." *See Widnall v. B3H Corp.,* 75 F.3d 1577, 1582, 1584 (Fed.Cir.1996); · *Lincoln Servs., Ltd. v. United States,* 230 Ct.Cl. 416, 429, 678 F.2d 157, 164 (1982) (in which the court found that given the circumstances of the case, the agency's failure to follow an agency guidance document in scoring technical and price factors was not of such significance that the decision should be set aside). Based on the administrative record, this court will not disturb the discretionary decision by the contracting officer that Hydro's proposal was not essentially equal to the top three offerors, one of which had received a perfect score and two of which had received scores of 195. "[T]he wide discretion accorded contracting officers extends to a broad range of procurement functions." *Shields Enters. v. United States,* 28 Fed.Cl. 615, 625 (1993). In sum, based on the record and the applicable case law, the court finds that the defendant's determinations regarding the final Design criteria scores assigned to Hydro and to the intervenor Centech were not arbitrary or capricious.

■ Hydro also argues that it should have received a higher evaluation score for the Schedule factor after Hydro revised its proposal in response to the initial comments received from the agency. In the initial evaluation, the agency had identified two deficiencies regarding Hydro's proposed schedule:

a. Schedule does not list all of the Phase I statement of work tasks and some of the tasks listed are not in the proper sequence. The schedule shows the Functional Configuration Audit (FCA) being conducted prior to fabrication of Engineering Design Test (EDT) hardware and prior to conduct of EDT. The FCA is conducted after completion of EDT.

b. Offeror did not provide a schedule for the Phase II effort.

After the revisions, the evaluators noted that although Hydro had addressed the two deficiencies, only one deficiency had been completely corrected, and one Schedule disadvantage remained.

Hydro disagrees with the evaluators' conclusion that the phase II GANTT chart represented a schedule disadvantage in plaintiff's proposal, in part, because, according to plaintiff, ETI did not receive a disadvantage for a GANTT chart that Hydro claims is indistinguishable from its own, and also because the evaluation report of plaintiff's revised proposal noted that: "[t]he offeror's discussion demonstrates their ability to meet the delivery schedule." Paragraph L.26.1.2.b(4) of the solicitation states: "The offeror shall provide as part of its proposal a time phased Gantt chart showing all contract deliverables, schedule of events, work phases, significant milestones to be accomplished, and the critical path. The schedule shall demonstrate the ability to meet the delivery schedule outlined in Section F." Whether Hydro could actually meet this delivery schedule is not fully responsive to the re-

---

**12.** If the decision not to raise Hydro's score for the corrections in the Design factor, other than environmental, was erroneous, plaintiff has not proven that such an error would have resulted in prejudice to Hydro. As discussed more fully below, plaintiff also did not receive full credit for the Related Experience, Program Management, and Schedule factors. If Hydro's score had been increased for each of the three corrections for the Design factor for which the evaluators recommended an increase, in all likelihood plaintiff's final score still would have been below the next higher offeror's, and below the range the contracting officer determined to be essentially equal (195–200), which included Centech, ETI, and SFA.

quirement in Paragraph L.26.1.2.b(4). Moreover, the government's comment that the offeror's discussion demonstrates its ability to meet the delivery schedule applied to a separate requirement from Schedule, *i.e.*, Related Experience. The evaluators determined that the GANTT chart included by Hydro in their revised proposal still lacked sufficient detail to justify full credit for the Schedule requirement, and still gave Hydro a disadvantage for this item. As stated by the evaluators upon review of plaintiff's revised proposal:

> Current status: The phase II GANTT chart shows only a general delivery schedule of 210 units per quarter. The GANTT chart should have shown the delivery of 70 units per month. The GANTT chart does not show PQT, fabrication, assembly, and inspection tasks.

Based on a comparison of the GANTT chart submitted by ETI and that submitted by Hydro, the court cannot conclude that the evaluator's decision to score Hydro with a disadvantage for the Schedule factor was unreasonable. ETI's GANTT chart clearly provides greater detail than Hydro's chart. Even a casual glance at the two charts reveals that there is more detailed information included in ETI's chart on the activities undertaken and the delivery dates for phase II production.

Plaintiff also complains that no points should have been deducted from its score for the Related Experience factor. Despite plaintiff's protestations, however, Hydro's score for the Related Experience factor also appears justified. Hydro, like Centech, did not receive full credit for this factor because points were deducted for lack of experience in a production effort of similar scope. Following submission of Hydro's revised proposal, the evaluators wrote:

> Current disadvantage: A majority of the offeror's previous experience is with GSA purchase orders and the proposed XM22 HPW effort is larger in scope than these previous efforts.

Previous disadvantages:

> a. Offeror has limited experience with Government development and production

contracts. The offeror also has limited experience with military unique reliability and maintainability requirements.

> Evaluation of response: The offeror's discussion demonstrates that two of the personnel assigned to the XM22 effort have related military experience. However, Hydro has limited related experience with military development contracts.

In fact, Hydro received three more points for this factor than Centech, which after the revised proposals were received still was scored with having a "minor disadvantage" in this area. In sum, the court finds that there appears to be a rational basis for the scoring of Hydro's revised proposal for the Related Experience factor.

Plaintiff also challenges the government's cost/technical tradeoff analysis included in the Technical & Price Tradeoff Analysis Report on several grounds. First, plaintiff claims that a procuring agency is required, under *Lockheed Missiles and Space Co. v. Bentsen,* 4 F.3d 955, to establish with reasonable certainty that the added value of the higher cost proposal is worth the higher price, and that in the above-captioned case, the agency's cost/technical tradeoff analysis fails this test. Plaintiff suggests that in order to properly arrive at its decision, the agency was required to ascribe particular dollar values to the advantages assigned to Centech's proposal. In *Lockheed,* the Court of Appeals for the Federal Circuit upheld the decision of the IRS to award a contract for computer systems, software, and support to an offeror whose proposal scored one point better than another proposal, but cost millions of dollars more. In so doing, the court found that the agency decision was justified "if the agency can demonstrate within a reasonable certainty that the added value of the proposal is worth the higher price." *Id.* at 960. Although the agency at issue in the *Lockheed* case did quantify the advantages and calculated productivity values in dollars, the circuit court did not hold specifically that evaluators must assign a dollar amount to technical strengths in order to demonstrate best value within a reasonable certainty. Nor did the *Lockheed* decision ar-

ticulate a higher standard of proof, or limit the broad discretion traditionally afforded a government agency during the procurement process. As the Federal Circuit subsequently clarified:

> Nothing in *Lockheed III* suggests the application of a different standard than what was applied before that decision, or that the quantum of proof in *Lockheed III* materially exceeded that found in earlier precedent. Indeed, neither the language nor the facts of the case show anything other than that *Lockheed III* is consistent with the principle that the Board's task upon review of a best value agency procurement is limited to independently determining if the agency's decision was grounded in reason. If this court wished to alter such a longstanding principle, it will do so explicitly with supporting rationale.

*Widnall v. B3H Corp.*, 75 F.3d 1577, 1584 (Fed.Cir.1996).[13]

The concern in *Lockheed* was that price had been discounted to such an extent in the price/technical tradeoff that it effectively rendered price meaningless because the successful bidder had offered a price of $500 million more than the protestor's bid, and one which was double the cost of another offer. *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d at 959. This same degree of concern is not presented here. The price differential between Centech and Hydro is much smaller than in *Lockheed*, and the concern is less acute. Plaintiff's offer was $19,799,413.50 versus $20,676,222.92 for Centech's offer, making Centech's proposal $876,809.42, or 4.4% greater than Hydro's offer. In the instant cost/technical tradeoff analysis, the evaluation team described the technical advantages beneficial to the Army, as well as the disadvantages to the Army included in the proposals submitted by Centech and Hydro. The team then weighed Centech's perfect merit score, five technical advantages,

and one minor disadvantage against Hydro's lower merit score, two technical advantages, two technical disadvantages, and $876,809.42 lower price. In the case at bar, there is nothing to suggest that the approach the agency employed in conducting its cost/technical tradeoff analysis discounted the price to such an extent that the price/technical tradeoff analysis was made meaningless.

Plaintiff also challenges various other aspects of the cost/technical tradeoff analysis, including that the evaluators improperly considered factors not substantially related to the solicitation requirements, that they considered only Centech's advantages, while failing to consider Hydro's advantages, and that a number of advantages identified by the evaluators in Centech's proposal, in fact, would provide no advantage. The court finds plaintiff's allegation that the agency failed to consider Hydro's advantages not merited. In their written evaluation report, the government evaluators identified nineteen advantages in Centech's proposal, including eight in design, and nine advantages in Hydro's proposal, including four in design. In conducting the cost/technical tradeoff analysis, the evaluators considered those technical advantages they judged to be beneficial to the Army. The Technical & Price Tradeoff Analysis Report specifically listed two technical advantages of Hydro's proposal: 1) "an all weather tarp to protect the system from adverse environmental conditions when the unit is stored on the trailer"; and 2) "a unique solution for the shower mode and vibration-transit drop requirement. . . . [which] should result in a more reliable unit."

To the extent plaintiff claims that the evaluation of the revised proposal and the cost/technical tradeoff analysis should have identified additional advantages in Hydro's proposal, or that the tradeoff analysis should have considered all of the advantages identified in plaintiff's revised proposal, Hydro misinterprets this court's standard of

---

**13.** Plaintiff quotes language from the majority decision in *B3H Corp. v. Department of the Air Force*, GSBCA No. 12813–P, 94–3 BCA ¶ 27,068, 1994 WL 372020, *mot. for reconsid. denied*, 94–3 BCA ¶ 27,124, 1994 WL 409079 (1994), for support of a more expansive view of this court's authority to review an agency's decision-making process. That decision was reversed in part and affirmed in part by *Widnall v. B3H Corp.*, 75 F.3d 1577 (Fed.Cir.1966). Specifically, the court reversed the GSBCA's grant of B3H's protest on the best value issue, finding that the Board should have deferred to the reasonable decision of the source selection authority. *Id.* at 1584.

review. As discussed above, the wide discretion accorded to contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over other proposals and what technical features would be beneficial to the Army. "[W]here an agency's decisions are highly technical in nature ... judicial restraint is appropriate and proper." *Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985). As stated by the United States Supreme Court:

Particularly when we consider a purely factual question within the area of competence of an administrative agency created by Congress, and when resolution of that question depends on 'engineering and scientific' considerations, we recognize the relevant agency's technical expertise and experience, and defer to its analysis unless it is without substantial basis in fact.

*Federal Power Comm'n v. Florida Power & Light Co.*, 404 U.S. 453, 463, 92 S.Ct. 637, 644, 30 L.Ed.2d 600, *reh'g denied*, 405 U.S. 948, 92 S.Ct. 929, 30 L.Ed.2d 819 (1972) One court has even gone so far as to state: "Accordingly, this court is in no position to challenge the technical merit of any comments made on the evaluation sheets or decisions made during the several stages of evaluation." *Compubahn v. United States*, 33 Fed. Cl. at 682–83 (footnote omitted). The question is not whether the court would reach the same conclusions as the agency regarding technical advantages, but rather whether the conclusions reached by the agency lacked a reasonable basis, and, thus, were arbitrary and capricious. "In simple terms, courts should not substitute their judgments for pre-award procurement decisions unless the agency clearly acted irrationally or unreasonably." *Commercial Energies, Inc. v. United States*, 20 Cl.Ct. 140, 145 (1990) (citing *Baird Corp. v. United States*, 1 Cl.Ct. 662 (1983)).

The court also should not award Hydro injunctive relief as a result of plaintiff's allegations that the advantages of Centech's proposal listed in the cost/technical tradeoff analysis are not actual advantages, and that Centech's proposal fails to meet material contract requirements. Plaintiff has alleged that Centech's electrical schematic illustrates an inoperative electrical system, that plaintiff's frame is far superior in strength to Centech's frame, that the purported burner efficiency of 93.8% of Centech's burner unit is insupportable according to the data it provided in its proposal and cannot be maintained for a 12–year life cycle, that the Centech machine cannot meet the weight requirement, and that Centech's remote fuel system will not operate properly. However, even if plaintiff is correct that there are technical difficulties in Centech's proposal, or that, in certain respects, Hydro's product has strengths not in Centech's product, so that the defendant made an erroneous decision, plaintiff has not proven that the agency officials did not make a reasoned decision, or knew or should have known that the system would not work before giving Centech credit. *See Keco II*, 203 Ct.Cl. at 578–79, 492 F.2d at 1206–07.

■■■ Moreover, even if plaintiff alleges the agency was negligent in not recognizing technical problems, that will not suffice to demonstrate arbitrary and capricious conduct. The mere failure to exercise due diligence in the appraisal of the advantageousness of a competitor's bid, when that omission amounts to simple negligence, is not a sufficient showing of arbitrary or capricious conduct. *Keco II*, 203 Ct.Cl. at 579, 492 F.2d at 1206–07.

The agency determined that all five of the revised offers received, including those from Centech and Hydro, were technically acceptable. Whether an offeror's proposal is technically advantageous or even acceptable is a determination within the agency's technical expertise and experience. In the above-captioned case, the government agency had past experience with high pressure washers and selected evaluators from several different disciplines, including a representative quality engineer, an individual from the U.S.A. chemical school, who was also a Combat Developer Representative, and a logistics manager. When the evaluators questioned whether an initial proposal had met a contract requirement, they sought clarification from the offeror. The determinations of technical acceptability and advantages or disadvantages, thus, appear to have been care-

fully considered in the procurement at issue and were based upon a reasonable factual basis and informed analysis.

■ Plaintiff also claims that the contracting officer used evaluation criteria which were significantly different from the announced solicitation evaluation factors, either in terms of content and/or relative importance. For example, plaintiff alleges that the tradeoff analysis was flawed because the Army improperly considered "burner efficiency and/or mean time between failure of the system" [14] among other factors considered. In the evaluation of revised proposals dated April 8, 1996, the evaluation team identified the heating coil [15] in Centech's proposal as a technical advantage in the Design area. The evaluators commented on the revised proposals that Centech's unique heating coil provided a much faster heat transfer rate than a conventional "pancake" style heating coil, thus reducing fuel consumption. In the cost/technical tradeoff analysis, the evaluation committee determined that this advantage would be beneficial to the Army. Specifically, the committee noted that the faster heat transfer rate of the heating coil utilized in Centech's proposal would reduce fuel consumption, "which will result in decreased logistics requirements for the unit as well as lower cost. Also, this unique heating coil is much more compact than other heating coils which will reduce the XM22 system weight." Regarding maintainability, the committee noted that Centech had:

performed maintainability and maintenance ratio prediction calculations that clearly demonstrated the proposed design exceeds the unit and direct support main-

tenance ratio requirements. CENTECH is the only offeror to provide a list of operations and maintenance functions that specific soldiers will be capable of performing. This demonstrates the offeror has extensive experience and knowledge about performing reliability and maintenance efforts.

Plaintiff claims that there is nothing in the solicitation to put offerors on notice that they would be judged by such criteria as burner efficiency and mean time between failure.

■ In order to show entitlement to relief on a claim that the agency used undisclosed evaluation factors, plaintiff must prove that the government evaluated the proposals received on a significantly different basis than announced in the solicitation and that plaintiff has been prejudiced as a result. *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 728 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). Initially, the court notes that technical advantages were not individually scored. The proposed design was worth a total of 90 points, more than twice that of any other factor. The agency's competitive evaluation plan, which was provided to the parties, stated:

(1) Proposed Design. The Government will evaluate the extent to which the offeror's proposed engineering modification of a commercial system or integration of commercial components meets the performance specification requirements. The Government will evaluate the extent to which the offeror demonstrates reasonable engineering approaches, methods, and techniques for ensuring the design is low technical risk. The Government will evalu-

---

**14.** The court assumes plaintiff is referring to system maintainability and reliability. The term "mean time between failure of the system" does not appear in either the technical evaluation of revised proposals or in the cost/technical tradeoff analysis. Paragraphs 3.3.5 and 3.3.6 of the solicitation state:

**3.3.5** *Reliability.* The HPW shall have a minimum Mean Time Between Mission Abort (MTBMA) OF 100 hours. A Mission Abort is defined as any failure that prevents the HPW from pumping or spraying water and is calculated using the following equation:

$$MTBMA = \frac{Operating\ Time}{Total\ No.\ of\ Mission\ Aborts}$$

**3.3.6** *Maintainability.* The HPW shall be capable of being maintained by Mission Operation Specialty (MOS) 54B soldiers with no increase in aptitude over the current level. . . . The HPW shall be designed so that all Preventive Maintenance, Checks, and Services (PMCS) and all scheduled maintenance can be performed while the HPW is mounted on the ¾ ton trailer under military field conditions. Corrosion resistance preventive maintenance shall be limited to routine washing, periodic inspection, and repair of accidental damage.

**15.** A type designation for the heating coil has been redacted.

ate the extent to which the offeror demonstrates an understanding of the highest risk requirements of this solicitation and proposes adequate methods to minimize these risks. The Government will evaluate the extent to which the offeror demonstrates the qualifications and expertise of the personnel assigned to the design effort. Only an offeror who demonstrated responsiveness to each of the merit evaluation factors (Proposed Design, Verification, Quality Assurance, Related Experience, Program Management, Manufacturing Capabilities, and Schedule) could receive a perfect score. To achieve a maximum score for a factor, the offeror had to provide sufficient information, as requested by section L of the solicitation, and satisfy the applicable performance specifications. Offerors did not receive bonus points for technical advantages. Even if burner efficiency and/or what plaintiff characterizes as mean time between failure did contribute to the merit scoring, plaintiff has not offered proof that either criteria was a predominant or even significant factor for the evaluators within the Design factor. *Cf. Isratex, Inc. v. United States*, 25 Cl.Ct. 223, 230 (1992) (granting a bid protest because the solicitation failed to put offerors on notice that a hydrostatic resistance test would be a predominant factor in the evaluation of proposals). Moreover, burner efficiency and/or reliability and maintainability were only two of many criteria the agency considered, and the plaintiff has not shown that it was prejudiced by consideration of these criteria as part of the cost/technical tradeoff analysis.

Furthermore, the court is not persuaded that burner efficiency and what plaintiff calls mean time between failure are unrelated to the performance specification requirements in the solicitation. Defendant argues that burner efficiency is related to the ability to heat water, which was a basic function of the XM22 high pressure washer, as indicated by

references in the solicitation to heated water or heating water.[16] As noted above, reliability and maintainability were included in the performance specification of the RFP in paragraphs 3.3.5 and 3.3.6. In sum, it appears reasonable for the evaluators to have considered burner efficiency and/or "mean time between failure" in assessing the relative technical advantages in the proposals received.

Other undisclosed factors the plaintiff apparently contends that the evaluators improperly considered in the tradeoff analysis were the offerors' use of military reliability models, and military experience. The plaintiff maintains that these factors were prohibited from use in the instant solicitation. According to the plaintiff, the Pentagon cancelled a previous solicitation providing military specifications for the same item, and directed that the new solicitation be prepared with commercial specifications. Plaintiff appears to argue that the evaluators determined that Centech exceeded the reliability requirement, thus giving it a technical advantage, because Centech used a military reliability model, while Hydro was not given a similar advantage for its schedule showing the operational hours and a replacement schedule for the HPW's various parts, because Hydro did not use a military reliability model. While the history of the predecessor solicitation to the one at bar is not part of the administrative record before this court, the court finds it difficult to accept that although a military reliability model may not have been a requirement in the instant solicitation, the agency would be precluded from any consideration of the unique needs of the HPW's intended consumer, the Army, or that the evaluators should not have acknowledged Centech for exceeding a requirement. Thus, the court finds that plaintiff has not demonstrated a reasonable likelihood that it can carry the

---

**16.** Paragraph 1.1. of the solicitation specifies that the system "shall have the capacity to deliver a restricted volume of heated or unheated water at variable high pressures, providing larger volumes of unheated water at lower pressures or providing a mix of heated and unheated water for personnel showers."
Paragraph 3.3.1.3 provides:

*Hot Water Delivery.* The HPW shall be capable of heating inlet water to at least 70 degrees C. (126 degrees F.) above the inlet water temperature in one pass, when operating at a minimum flowrate of 5 gpm at 3000 psi.... The HPW shall be capable of generating the specified temperature rise within five (5) minutes from a cold start.

burden of proof to demonstrate that the agency used undisclosed evaluation criteria.

■ As further evidence of the government's arbitrary and capricious conduct, plaintiff alleges that the agency violated relevant statutes. Although the court in *Keco II* recognized that violations of relevant statutes or regulations may form the basis for recovery, the court indicated that not all violations of statutes or regulations warrant relief. *Keco Indus., Inc. v. United States,* 203 Ct.Cl. at 574, 492 F.2d at 1204. Plaintiff must show a "clear and prejudicial" violation. *Central Arkansas Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995) (citing *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988)). "[O]nly violations that amount to a breach of the government's implied contract to consider an offer fairly and honestly will support the court's exercise of its injunctive powers." *Id.*

■ Plaintiff alleges two statutory violations. First, plaintiff claims that the use of military reliability and experience factors constituted undisclosed evaluation factors in violation of 10 U.S.C. § 2305(a)(2)(A) (1994),[17] which requires that solicitations include a statement of all significant factors and significant subfactors which will be used in the evaluation, and the relative importance of each. The solicitation at issue clearly indicated that reliability and related experience would be factors in the evaluation. Although none of the pertinent sections mentions the word military, no limitations were placed on offerors regarding the use of military parts or to evidence military experience. Plaintiff has not demonstrated that an emphasis on military standards or experience was emphasized or weighed heavily in the overall evaluation. All the parties who submitted offers clearly knew that the product solicited was to be used by the Army. Moreover, bald accusations made by plaintiff in its reply brief against Kiet Ly (one of the evaluators who allegedly marked Hydro down for the Related Experience factor) are unsupported in the record currently before the court. The plaintiff has failed to establish a reasonable likelihood that it can demonstrate a clear violation of 10 U.S.C. § 2305, prejudicial to the plaintiff.

■ Second, plaintiff argues that the agency violated the Federal Acquisition Streamlining Act of 1994, Pub.L. No. 103–355, 108 Stat. 3243 (1994) (FASA), as codified at 10 U.S.C. § 2377, by giving Centech a technical advantage for its heating coil, which allegedly is a sole source part. Plaintiff also alleges that FASA was violated when military experience and reliability factors were used by the evaluators and the defendant allegedly tried to limit the award to military contractors with past experience. The relevant provision of FASA, as codified at 10 U.S.C. § 2377, states:

**§ 2377. Preference for acquisition of commercial items**

(a) PREFERENCE.—The head of an agency shall ensure that, to the maximum extent practicable—

(1) requirements of the agency with respect to a procurement of supplies or services are stated in terms of—

(A) functions to be performed;

(B) performance required; or

(C) essential physical characteristics;

(2) such requirements are defined so that commercial items or, to the extent that commercial items suitable to meet the agency's needs are not available, nondevelopmental items other than commercial items, may be procured to fulfill such requirements; and

(3) offerors of commercial items and nondevelopmental items other than commercial items are provided an opportunity

---

**17.** In relevant part, 10 U.S.C. § 2305(a)(2) states:
(2) ... [A] solicitation for sealed bids or competitive proposals ... shall at a minimum include—
(A) a statement of—
(i) all significant factors and significant subfactors which the head of the agency reasonably expects to consider in evaluating sealed bids (including price) or competitive proposals (including cost or price, cost-related or price-related factors and subfactors, and noncost-related or nonprice-related factors and subfactors); and
(ii) the relative importance assigned to each of those factors and subfactors; ....

to compete in any procurement to fill such requirements.

The heating coil proposed by Centech was to be completely fabricated in-house by Centech's subcontractor.[18] According to plaintiff, Centech was awarded an advantage for its unique * * *,[19] even though, allegedly, it was a part fabricated in-house only by Centech's subcontractor and more readily available commercial parts, allegedly, were obtainable. In fact, the advantage was awarded for specific qualities,[20] which reduced system weight. In awarding Centech an advantage for * * *, the evaluators referred to it as "an unique and highly efficient * * * heating coil that is completely fabricated in-house using specialized * * * equipment by the offeror's subcontractor, * * *."

Although the evaluators referred to the in-house fabrication by Centech's subcontractor, it is not clear that the subcontractor is the only manufacturer capable of producing the unit, or that the design is not commercially available from the subcontractor or another manufacturer. Centech's proposal states:

> Our Team's XM22 design uses a proven burner and coil system which is used in the high pressure * * * cleaners * * * [another subcontractor to Centech] currently produces for the Navy. This design is also used by their commercial line of HPWs. ... This technology is the most efficient burner and coil system available anywhere in the world.

Plaintiff has made no effort to present evidence contrary to this statement. Therefore, it appears from the record that at least one other company, Ghibli, could have supplied the heating coil Centech proposed to use, and for which Centech received an advantage.

Even, for argument's sale, if the heating coil was not commercially available, it is difficult to document prejudice to this plaintiff based on one unscored advantage, in the context of the overall scoring of the Hydro and Centech proposals. In the evaluation,

Centech received only one, unscored Design advantage for inclusion of the coil in its proposal. Moreover, not only is 10 U.S.C. § 2377 introduced by the words "to the maximum extent practicable," but the solicitation also contemplated that the offerors could use sole source or proprietary parts in their XM22 designs. Paragraph C.3.1.1.4.1 of the solicitation requires the contractor to maintain "separate listings of parts that are: high cost (exceeding $500.00), long procurement lead time (exceeding 3 months), sole source, proprietary, and commercial parts."

Regarding the use of military experience and reliability factors, once again, plaintiff has failed to substantiate its allegations. As indicated above, all parties who submitted offers pursuant to the proposal knew the product would be used by the Army, and no limitations were placed on offerors regarding the use of military parts or to evidence military experience. In the overall scoring or comparisons between the offerors, the evidence does not suggest that any advantages Centech received for military experience and reliability made the difference in the choice of Centech as the apparently successful offeror.

■■■ Finally, plaintiff claims that agency personnel conducted the evaluation in bad faith. When analyzing whether bad faith existed on the part of selection officials, this court must "presume that public officials act 'conscientiously in the discharge of their duties.'" *Compubahn, Inc. v. United States,* 33 Fed.Cl. 677, 682 (1995) (quoting *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301 (1976), *cert. denied,* 434 U.S. 830, 98 S.Ct. 112, 54 L.Ed.2d 89 (1977)). To overcome this presumption, "[i]n the cases where the court has considered allegations of bad faith, the necessary 'irrefragable proof' has been equated with evidence of some *specific intent to injure the plaintiff.*" *Kalvar Corp. v. United States,* 211 Ct.Cl. at 198–99, 543 F.2d at 1302.

---

**18.** The name of Centech's subcontractor has been redacted.

**19.** * * * designates that material has been redacted.

**20.** The specific qualities identified by the evaluators have been redacted.

In alleging bad faith, plaintiff claims that the agency actions amounted to a "conspiracy to get rid of plaintiff." Among other allegations, plaintiff claims that the agency "cook[ed] the books," used "falsified documents," used "fraudulent engineering practices," and pulled an "undisclosed evaluation factor 'out of the hat'" in order to justify the award to Centech. One of the major sources of plaintiff's allegations of bad faith and malicious intent is an undated, one-page document, titled "Evaluation of Life Cycle Costs for CENTECH's Technical Advantages" (hereinafter "Life Cycle Analysis").[21] Plaintiff, however, also makes additional allegations against members of the defendant's evaluation and selection team, and argues that "the totality of the circumstances" substantiate the existence of the contracting officer's bad faith.

Plaintiff argues that the engineering analysis included in the Life Cycle Analysis "is both erroneous and seriously flawed and shows bad faith and an inherent bias by the Government against Hydro." For its bad faith argument, plaintiff's counsel appears to rely heavily on a May 31, 1996 e-mail from the contracting officer, Ms. Josephine Barker, to a member of the evaluation team, Mr. Willard (Bill) Betts, requesting an analysis which would put dollar amounts on the savings offered by the advantages in the Centech proposal. Although the Life Cycle Analysis was undated, because the Life Cycle Analysis appears to have complied with this request by assigning dollar values to Centech's advantages, presumably this was the document which responded to Ms. Barker's May 31, 1996 request. Defendant's counsel represented in court that he believes the Life Cycle Analysis was drafted in early June 1996, in order to provide additional justification for the selection, but after the contracting officer had made her source selection decision on May 30, 1996. Because the Life Cycle Analysis appears to have been prepared after the source selection of the apparently successful offeror, it also appears clear that the contracting officer did not rely upon it when making her selection decision on May 30, 1996.

Counsel for defendant informed the court that, despite the date of its origin after the source selection decision, the Life Cycle Analysis was made part of the administrative record submitted to the GAO, as enclosure 3 to the May 10, 1996 memorandum to the contract specialist from the evaluation team, regarding its review and evaluation of BAFO proposals (hereinafter, the BAFO Report). Defendant, however, requested that the document not be included in the administrative record before this court because it had not been used in arriving at the source selection decision. Based on the evidence presented, this court ordered that the Life Cycle Analysis could be used by the parties only on the issue of bad faith on the part of government officials. Pursuant to later discussions in court, defendant attached to its summary judgment motion the declarations of the contracting officer, Ms. Barker, the contract specialist, Ms. Angela Sawyer, and the author of the Life Cycle Analysis, Mr. Betts, setting forth their recollections of the events that led to the placement of the Life Cycle Analysis as an enclosure to both the BAFO Report and the Price Analysis. In his declaration, Mr. Betts stated that "someone told me to make the draft Memorandum for Record [Life Cycle Analysis] an 'Enclosure 3' to the Best and Final Offer Report. I do not recall who made this comment to me." Mr. Betts left a hard copy of the Life Cycle Analysis with an "Enclosure 3" cover sheet on the desk of Angela Sawyer, the contract specialist, who attached it behind enclosure 2 to the May 10, 1996 BAFO Report.

Plaintiff contends that the Life Cycle Analysis was based on reasoning that was "fallacious, unsound, and a wanton and reckless disregard for the truth," and that the contracting officer improperly used it to "cook the books" to support a procurement decision after the fact. Plaintiff alleges that the defendant's improper motive was its desire to "deny Hydro award of this contract at issue at any cost because of its suspected involvement with a previous protester to the original solicitation, Delta Pacific Group, Inc."

---

21. The inclusion or use of the Life Cycle Analysis in the proceedings before this court were discussed with all parties in a hearing on September 24, 1996.

Defendant responds that the Life Cycle Analysis and Ms. Barker's e-mail message do not support plaintiff's allegations, because there is no evidence that the Life Cycle Analysis was flawed. The defendant also argues that the words of the e-mail message from the contracting officer demonstrate that the contracting officer thought that the decision to select Centech as the apparently successful offeror was correct, and that she only was looking for additional support for her decision.

Regardless of the motivation, the court notes that consistent with its September 24, 1996 order, the court will not review the conclusions contained in the Life Cycle Analysis and will not use it to support defendant's justification of the selection of Centech's proposal by the Army. Regarding the issue of bad faith, the court notes that the e-mail sent by Ms. Barker details the technical reasons Centech's proposal was considered the best value to the government. The e-mail message in its entirety states:

Subject: Cost–Technical Trade Off

Message–ID: . . .

Bill,

I spoke to David [chairman of the ad-hoc evaluation committee] and mentioned it again at one our meetings with Lisa [agency counsel], that it would help if we could put $ to the savings that the advantages of Centech's proposal offers.

1. The unique heating coil provides a faster heat transfer rate that reduces fuel consumption by what percent with a savings of $ per what ever. Decrease Logistics requirements for the unit as well is how much of a savings anticipated. The compact size which will reduce the systems weight by how many pounds that also helps with a savings on the fuel consumption with an estimated savings of $.

2. Reliability data of the major components, and the maintainability and maintenance ratio prediction calculations clearly demonstrated the proposed design exceeds the unit and direct support maintenance ratio requirements which will also save approximately $ with a lower life cycle cost for the unit/system.

3. * * * frame will minimize corrosion problems, reduce system weight, increase the frame strength and increase system reliability which will result in a lower life cycle cost of approximately $ per system or unit.

What I am looking for is a dollar savings in either the area of fuel, maintenance, weight, which is critical which in turn saves on fuel consumption, logistic support savings which rolls up into the life cycle cost savings. I hope that all of the savings will off set the difference in Hydro's price and Centech's. I realize that Centech's proposal offers the best value, I just need $$$ to show it.

Thanks,

Josephine

The language of the first and last paragraphs of the e-mail message suggests that the contracting officer was looking for additional support to back up the source selection decision she had already made based on the technical strengths described in the text of the message, not that she considered her decision weak or improper. In fact, in the last paragraph, she states, "I realize that Centech's proposal offers the best value, I just need $$$ to show it." Although the words of the contracting officer are not prudent, standing alone they are not enough to establish bad faith on her part. Moreover, plaintiff's suggestion that the government had an obligation to undertake a Life Cycle Analysis and assign dollar values to the advantages offered by Centech, in order to establish with reasonable certainty that Centech's proposal was worth the higher price before arriving at a source selection decision is incorrect. Although Hydro alleges that the contracting officer's after the fact request for a Life Cycle Analysis contributes to the totality of circumstances which demonstrate her bad faith, as well as the bad faith of the other agency officials involved in the source selection, plaintiff has failed to document its allegations and has failed to demonstrate a reasonable likelihood of success on the merits of its argument that the agency officials acted in bad faith. In other words, plaintiff has not met its burden of rebutting the presump-

tion that the agency officials acted in good faith.

▮ Plaintiff also points to discrepancies in the dates and attributions in various documents in the administrative record as further evidence of the agency's bad faith. For example, plaintiff points to a May 22, 1996 e-mail message from the contract specialist to the evaluation team suggesting changes to a price evaluation, while the revised price evaluation included in the BAFO Report is dated May 10, 1996. In addition, the BAFO Report, which plaintiff alleges was still being revised on May 22, 1996, is signed by Mr. David W. Deane, chairperson of the *ad hoc* evaluation committee, whose last day with the agency was May 10, 1996. Plaintiff seems to suggest that these alleged discrepancies cast doubt on the date and attributions of all crucial documents in the administrative record.

▮ Not every error in the procurement process justifies relief. *Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996). Errors that are "so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of the contemplated contract will not be affected, ..." are *"de minimus"* and are not a basis for overturning award. *Andersen Consulting v. United States,* 959 F.2d 929, 935 (Fed.Cir.1992). Similarly, in *Keco Industries, Inc. v. United States,* 203 Ct.Cl. at 573, 492 F.2d at 1203 (*Keco II*), the court stated: "But if one thing is plain in this area it is that not every irregularity, no matter how small or immaterial, gives rise to the right to be compensated for the expense of undertaking the bidding process." *Id.*

According to the United States Court of Appeals for the Federal Circuit:

A protestor bears the burden of proving error in the procurement process sufficient to justify relief. *CACI Field Servs.,* 854 F.2d at 466. Not every error compels the rejection of an award. *See SMS Data Prods. Group, Inc. v. United States,* 900 F.2d 1553, 1557 (Fed.Cir.1990); *Excavation Constr., Inc. v. United States,* 204 Ct.Cl. 299, 494 F.2d 1289, 1293 (1974); 40 U.S.C. § 759(f)(5)(B) (1994). The Board

must consider the significance of errors in the procurement process when deciding whether the overturning of an award is appropriate. *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996); *Andersen Consulting v. United States,* 959 F.2d at 932–33, 935. "De minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can safely be ignored and the main purposes of contemplated contract will not be affected if they are." *Id.* at 935.

*Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 1000 (Fed.Cir.1996). The standard of review for the denial of a procedural right at the agency level, even one that is statutory, is harmful error. *Harp v. Department of the Army,* 791 F.2d 161, 163 (Fed.Cir.1986); *Handy v. United States Postal Serv.,* 754 F.2d 335, 338 (Fed.Cir.1985). Even assuming that some dating and attribution errors occurred, plaintiff has not met its burden of proof and has not shown a likelihood of success on the merits of its argument that the errors the Army may have committed were significant, or that plaintiff was harmed by them.

### CONCLUSION

After careful consideration of the parties' pleadings, the administrative record, and the applicable law, the court concludes that plaintiff has failed to show a reasonable likelihood of success on the merits and has failed to sustain the burden of proof necessary to demonstrate that injunctive relief is warranted. Despite plaintiff's repeated use of strong vocabulary accusing the agency officials of malfeasance and bad faith in its complaint and subsequent filings in this court, to date plaintiff has failed to demonstrate a likelihood that it can prove that the agency acted arbitrarily or capriciously, or in bad faith when it made its source selection decision to choose Centech as the apparently successful offeror. Accordingly, plaintiff's motions for a temporary restraining order or a preliminary injunction are, hereby, **DENIED.**

Although the court believes that the likelihood that plaintiff can succeed on the merits of the claims presented by the complaint filed

in the above-captioned case is slim, and that the plaintiff faces an extremely steep uphill challenge to demonstrate to this court that more than just a few harmless errors in the procurement occurred, the court is reluctant to dismiss plaintiff's complaint at this time. By nature, requests for injunctive relief must be briefed on an expedited schedule. This case was no exception. By itself, the expedited nature of the proceedings would not cause concern. Coupled, however, with the court's refusal to allow counsel Sternberg's admission to the protective order, the many documents in the case, the sometimes confusing claims made by plaintiff and the repeated revisions to plaintiff's filings, the court is reluctant to reach a final decision on the merits of the claims without affording the plaintiff an opportunity to obtain additional counsel if it wishes for any further proceedings on the merits. The court remains confident that its decision not to admit Manfred Sternberg, Esq., to the protective order was correct. Nonetheless, plaintiff, if it chooses to proceed, with additional time, may choose to go forward just with Mr. Rudloff as counsel, or to seek additional representation.